**PETITION FOR A WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY**

Name  McKean    Ronald    P
(Last)       (First)       (Initial)

**FILED**

Prisoner Number  V22458

MAY 2 0 2008

Institutional Address  Pleasant Valley State Prison
Pob 8504 Coalinga Ca 93210

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

Ronald Paul McKean
(Enter the full name of plaintiff in this action.)

vs.

James A. Yates  warden

(Enter the full name of respondent(s) or jailor in this action)

E-filing

2548

JF  (PR

Case No. _____
(To be provided by the clerk of court)

**PETITION FOR A WRIT**
**OF HABEAS CORPUS**

==================================================

Read Comments Carefully Before Filling In

==================================================

**When and Where to File**

You should file in the Northern District if you were convicted and sentenced in one of these

counties: Alameda, Contra Costa, Del Norte, Humboldt, Lake, Marin, Mendocino, Monterey, Napa,

San Benito, Santa Clara, Santa Cruz, San Francisco, San Mateo and Sonoma.  You should also file in

this district if you are challenging the manner in which your sentence is being executed, such as loss of

good time credits, and you are confined in one of these counties.  Habeas L.R. 2254-3(a).

If you are challenging your conviction or sentence and you were not convicted and sentenced in

one of the above-named fifteen counties, your petition will likely be transferred to the United States

District Court for the district in which the state court that convicted and sentenced you is located.  If

you are challenging the execution of your sentence and you are not in prison in one of these counties,

your petition will likely be transferred to the district court for the district that includes the institution

where you are confined.  Habeas L.R. 2254-3(b).

PET. FOR WRIT OF HAB. CORPUS          - 1 -

Who to Name as Respondent

You must name the person in whose actual custody you are. This usually means the Warden or jailor. Do not name the State of California, a city, a county or the superior court of the county in which you are imprisoned or by whom you were convicted and sentenced. These are not proper respondents.

If you are not presently in custody pursuant to the state judgment against which you seek relief but may be subject to such custody in the future (e.g., detainers), you must name the person in whose custody you are now <u>and</u> the Attorney General of the state in which the judgment you seek to attack was entered.

A. INFORMATION ABOUT YOUR CONVICTION AND SENTENCE

1. What sentence are you challenging in this petition?

(a) Name and location of court that imposed sentence (for example; Alameda County Superior Court, Oakland):

<u>Santa Clara County Superior court</u>    <u>Palo Alto Ca.</u>

Court                                    Location

(b) Case number, if known <u>BB 256062</u>

(c) Date and terms of sentence <u>1-26-04</u>    <u>40 years to life</u>

(d) Are you now in custody serving this term? (Custody means being in jail, on parole or probation, etc.)    Yes <u>X</u>    No _____

Where?

Name of Institution: <u>Pleasant Valley State Prison</u>

Address: <u>Pob B504 Coalinga Ca 93210</u>

2. For what crime were you given this sentence? (If your petition challenges a sentence for more than one crime, list each crime separately using Penal Code numbers if known. If you are challenging more than one sentence, you should file a different petition for each sentence.)

<u>PC 187</u>

<u>PC 12022.53</u>

PET. FOR WRIT OF HAB. CORPUS        - 2 -

3. Did you have any of the following?

                Arraignment:               Yes X    No ____

                Preliminary Hearing:    Yes X    No ____

                Motion to Suppress:    Yes X    No ____

4. How did you plead?

          Guilty ____    Not Guilty X    Nolo Contendere ____

          Any other plea (specify) _____

5. If you went to trial, what kind of trial did you have?

          Jury X    Judge alone ____    Judge alone on a transcript ____

6. Did you testify at your trial?          Yes ____    No ____

7. Did you have an attorney at the following proceedings:

      (a)    Arraignment          Yes X    No ____

      (b)    Preliminary hearing    Yes X    No ____

      (c)    Time of plea         Yes X    No ____

      (d)    Trial              Yes X    No ____

      (e)    Sentencing         Yes X    No ____

      (f)    Appeal            Yes X    No ____

      (g)    Other post-conviction proceeding    Yes X    No ____

8. Did you appeal your conviction?

      (a)    If you did, to what court(s) did you appeal?    Yes X    No ____

              Court of Appeal

              Year: 2007    Result: denied _____

              Supreme Court of California    Yes ____    No ____

              Year: _____    Result: _____

              Any other court    Yes ____    No ____

              Year: _____    Result: _____

      (b)    If you appealed, were the grounds the same as those that you are raising in this

petition?                              Yes  X      No____

(c)    Was there an opinion?          Yes  X      No____

(d)    Did you seek permission to file a late appeal under Rule 31(a)?

Yes ____      No  X

If you did, give the name of the court and the result:

_____

_____

_____

9. Other than appeals, have you previously filed any petitions, applications or motions with respect to this conviction in any court, state or federal?          Yes ____      No  X

[Note: If you previously filed a petition for a writ of habeas corpus in federal court that challenged the same conviction you are challenging now and if that petition was denied or dismissed with prejudice, you must first file a motion in the United States Court of Appeals for the Ninth Circuit for an order authorizing the district court to consider this petition. You may not file a second or subsequent federal habeas petition without first obtaining such an order from the Ninth Circuit. 28 U.S.C. §§ 2244(b).]

(a)    If you sought relief in any proceeding other than an appeal, answer the following questions for each proceeding. Attach extra paper if you need more space.

I.    Name of Court: _____

Type of Proceeding: _____

Grounds raised (Be brief but specific):

a._____

b._____

c._____

d._____

Result: _____Date of Result:_____

II.   Name of Court: _____

Type of Proceeding: _____

Grounds raised (Be brief but specific):

PET. FOR WRIT OF HAB. CORPUS          - 4 -

1   a._____

2   b._____

3   c._____

4   d._____

5   Result: _____ Date of Result:_____

6   III.   Name of Court: _____

7   Type of Proceeding: _____

8   Grounds raised (Be brief but specific):

9   a._____

10   b._____

11   c._____

12   d._____

13   Result: _____ Date of Result:_____

14   IV.   Name of Court: _____

15   Type of Proceeding: _____

16   Grounds raised (Be brief but specific):

17   a._____

18   b._____

19   c._____

20   d._____

21   Result: _____ Date of Result:_____

22   (b)   Is any petition, appeal or other post-conviction proceeding now pending in any court?

23                              Yes _____    No_____

24   Name and location of court: _____

25   **B. GROUNDS FOR RELIEF**

26   State briefly every reason that you believe you are being confined unlawfully. Give facts to

27   support each claim. For example, what legal right or privilege were you denied? What happened?

28   Who made the error? Avoid legal arguments with numerous case citations. Attach extra paper if you

PET. FOR WRIT OF HAB. CORPUS          - 5 -

need more space.  Answer the same questions for each claim.

[Note:  You must present ALL your claims in your first federal habeas petition.  Subsequent petitions may be dismissed without review on the merits.  28 U.S.C. §§ 2244(b); McCleskey v. Zant, 499 U.S. 467,  111 S. Ct. 1454, 113 L. Ed. 2d 517 (1991).]

Claim One: Brady Violation

Brady v. Maryland   373 U.S. 83 (1963)

Supporting Facts: See attached

Claim Two:

Supporting Facts:

Claim Three:

Supporting Facts:

If any of these grounds was not previously presented to any other court, state briefly which grounds were not presented and why:

PET. FOR WRIT OF HAB. CORPUS           - 6 -

1    List, by name and citation only, any cases that you think are close factually to yours so that they

2    are an example of the error you believe occurred in your case. Do not discuss the holding or reasoning

3    of these cases:

4    _____See   attached_____

5    _____

6    _____

7    Do you have an attorney for this petition?                Yes_____    No__✓__

8    If you do, give the name and address of your attorney:

9    _____

10    WHEREFORE, petitioner prays that the Court grant petitioner relief to which s/he may be entitled in

11    this proceeding. I verify under penalty of perjury that the foregoing is true and correct.

12                    5-3-08

13    Executed on_____                _Ronald Paul McKean_____

14                    Date                                    Signature of Petitioner

15

16

17

18

19

20    (Rev. 6/02)

21

22

23

24

25

26

27

28

PET. FOR WRIT OF HAB. CORPUS            - 7 -

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

STATEMENT OF APPEALABILITY . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE FACTS . . . . . . . . . . . . . . . . . . . . . . . . 4

THE DEFENSE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

DISCUSSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

   1.   Improper Instructions that Diluted the
      Law of Self-Defense and Imperfect
      Self-Defense . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

   2.   Erroneously Incomplete Instructions
      on the Legal Concept of Self-Defense
      by an Aggressor . . . . . . . . . . . . . . . . . . . . . . . . . 30

   3.   Erroneous and Incomplete Instructions
      on Imperfect Self-Defenses . . . . . . . . . . . . . . . . . 35

   4.   Erroneous and Incomplete Instructions
      on Imperfect Self-Defenses . . . . . . . . . . . . . . . . . 41

   5.   Discovery Violations and New Evidence
      as to Issues Pertaining to the Credibility
      of a Key Prosecution Witness . . . . . . . . . . . . . . . 50

   6.   The Cumulative Effect of the Errors . . . . . . . . . . . 66

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

CERTIFICATE OF COMPLIANCE . . . . . . . . . . . . . . . . . . . . . . 68

PROOF OF SERVICE BY MAIL

# TABLE OF AUTHORITIES

## FEDERAL CASES CITED

Page

Brady v. Maryland
    (1963) 373 U.S. 83 [10 L.Ed.2d 215] . . . . . . . . . . . . .    62

Carella v. California
    (1989) 419 U.S. 263 [105 L.Ed.2d 218] . . . . . . . . . . .    46

Chapman v. California
    (1967) 386 U.S. 18 [17 L.Ed.2d 705] . . . . . . . . . . . 28, 34, 49, 50

Connecticut v. Johnson
    (1983) 416 U.S. 73 [74 L.Ed.2d 823] . . . . . . . . . . . . .    46

Cooper v. Sowders
    (6th Cir. 1988) 837 F.2d 284 . . . . . . . . . . . . . . . . . .    67

Doyle v. Ohio
    (1976) 426 U.S. 610 [49 L.Ed.2d 91] . . . . . . . . . . . .    49

Francis v. Franklin
    (1985) 471 U.S. 307 [85 L.Ed.2d 344] . . . . . . . . . . .    28

Giglio v. United States
    (1972) 405 U.S. 150 [31 L.Ed.2d 104] . . . . . . . . . . .    62

Griffin v. California
    (1965) 380 U.S. 609 [14 L.Ed.2d 106] . . . . . . . . . . .    49

Kyles v. Whitley
    (1995) 514 U.S. 419 [131 L.Ed.2d 490] . . . . . . . . . . .    62

Rose v. Clark
    (1986) 478 U.S. 570 [92 L.Ed.2d 460] . . . . . . . . . . . .    46

Sandstrom v. Montana
    (1979) 422 U.S. 510 [61 L.Ed.2d 39] . . . . . . . . . . . . .    46

United States v. Agars
        (1976) 427 U.S. 97 [49 L.Ed.2d 342] . . . . . . . . . . . .        62

United States v. Bailey
        (1985) 473 U.S. 667 [87 L.Ed.2d 481] . . . . . . . . . . .        62

United States v. Hastings
        (1983) 461 U.S. 499 [76 L.Ed.2d 96] . . . . . . . . . . . .        49

## CALIFORNIA CASES CITED

In re Christian S.
        (1994) 7 Cal.4th 768 . . . . . . . . . . . . . . . . . . . . . . . .        38, 39

In re Ferguson
        (1971) 5 Cal.3d 525 . . . . . . . . . . . . . . . . . . . . . . .        62

In re Pratt
        (1999) 69 Cal.App.4th 1294 . . . . . . . . . . . . . . . . . .        66

In re Sassounian
        (1995) 9 Cal.4th 535 . . . . . . . . . . . . . . . . . . . . . . .        66

In re Williams
        (1994) 7 Cal.4th 572 . . . . . . . . . . . . . . . . . . . . . . .        62

People v. Anderson
        (1968) 70 Cal.2d 15 . . . . . . . . . . . . . . . . . . . . . . .        44-45

People v. Banks
        (1976) 67 Cal.App.3d 379 . . . . . . . . . . . . . . . . . . .        25

People v. Barton
        (1995) 12 Cal.4th 186 . . . . . . . . . . . . . . . . . . . . . .        37

People v. Brevermann
        (1998) 19 Cal.4th 142 . . . . . . . . . . . . . . . . . . . . . . .        29, 37, 41

People v. Cardenas
        (1982) 31 Cal.3d 897 . . . . . . . . . . . . . . . . . . . . . . .        67

People v. Colantuono
    (1994) 7 Cal.4th 206 . . . . . . . . . . . . . . . . . . . . . .   46

People v. Collins
    (1961) 187 Cal.App.2d 575. . . . . . . . . . . . . . . . . .   22

People v. Cornett
    (1948) 33 Cal.2d 33 . . . . . . . . . . . . . . . . . . . . . . 25, 28, 45

People v. Craig
    (1957) 49 Cal.2d 313 . . . . . . . . . . . . . . . . . . . . .   45

People v. Cummings
    (1993) 4 Cal.4th 1233 . . . . . . . . . . . . . . . . . . . . 27, 33, 40

People v. Dawson
    (1948) 88 Cal.App.2d 85 . . . . . . . . . . . . . . . . . . .   23

People v. Deloney
    (1953) 41 Cal.2d 832 . . . . . . . . . . . . . . . . . . . . .   45

People v. Flood
    (1998) 18 Cal.4th 470 . . . . . . . . . . . . . . . . . . . . 27, 33, 40

People v. Frye
    (1992) 7 Cal.App.4th 1148 . . . . . . . . . . . . . . . . . .   45

People v. Garcia
    (1972) 27 Cal.App.3d 639 . . . . . . . . . . . . . . . . . .   45

People v. Garcia
    (1969) 275 Cal.App.2d 517 . . . . . . . . . . . . . . . . .   22

People v. Givans
    (1985) 166 Cal.App.3d 793 . . . . . . . . . . . . . . . . . 49, 50

People v. Gleghorn
    (1987) 193 Cal.App.3d 196 . . . . . . . . . . . . . . . . . 31-32

People v. Gonzalez
    (1990) 51 Cal.3d 1179 . . . . . . . . . . . . . . . . . . . . .   47

People v. Harvey
 (1992) 2 Cal.4th 86 . . . . . . . . . . . . . . . . . . . . . . . . . . 49

People v. Hill
 (1998) 17 Cal.4th 800 . . . . . . . . . . . . . . . . . . . . . . . . 47

People v. Holt
 (1984) 37 Cal.3d 436 . . . . . . . . . . . . . . . . . . . . . . . . 67

People v. Jackson
 (1965) 233 Cal.App.2d 639 . . . . . . . . . . . . . . . . . . . 22, 23

People v. Kelley
 (1980) 113 Cal.App.3d 1005 . . . . . . . . . . . . . . . . . . 45

People v. Kronemyer
 (1987) 189 Cal.App.3d 314 . . . . . . . . . . . . . . . . . . . 67

People v. Loggins
 (1972) 23 Cal.App.3d 597 . . . . . . . . . . . . . . . . . . . . 45

People v. Marshall
 (1996) 13 Cal.4th 799 . . . . . . . . . . . . . . . . . . . . . . . 47

People v. Pineiro
 (1982) 129 Cal.App.3d 915 . . . . . . . . . . . . . . . . . . . 25

People v. Quach
 (2004) 116 Cal.App.4th 294 . . . . . . . . . . . . . . . . . 28, 31, 34

People v. Ruthford
 (1975) 14 Cal.3d 399 . . . . . . . . . . . . . . . . . . . . . . . . 62

People v. Sawyer
 (1967) 256 Cal.App.2d 66 . . . . . . . . . . . . . . . . . . . . 31

People v. Sweeney
 (1960) 55 Cal.2d 27 . . . . . . . . . . . . . . . . . . . . . . . . . 4

People v. Vargas
 (1973) 9 Cal.3d 470 . . . . . . . . . . . . . . . . . . . . . . . . 49, 50

People v. Watson
    (1956) 46 Cal.2d 818 . . . . . . . . . . . . . . . . . . . . . . 29, 41, 49

People v. Wyatt
    (1972) 22 Cal.App.3d 671 . . . . . . . . . . . . . . . . . . . . .    22

## CONSTITUTIONS CITED

United States Constitution, Fifth Amendment . . . . . . . . . . .    67

United States Constitution, Fourteenth Amendment . . . . . . .  62, 67

## STATUTES CITED

Penal Code, section 187 . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1

Penal Code, section 1237, subdivision (a) . . . . . . . . . . . . . .    1

Penal Code, section 12022.5, subdivision (a)(1) . . . . . . . . .  1, 2

Penal Code, section 12022.53, subdivisions (b) . . . . . . . . .    2

Penal Code, section 12022.53, subdivision (c) . . . . . . . . . .    2

Penal Code, section 12022.53, subdivision (d) . . . . . . . . . .  2, 3

## JURY INSTRUCTIONS CITED

CALJIC No. 5.12 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18, 19

CALJIC No. 5.15 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19, 25

CALJIC No. 5.17 . . . . . . . . . . . . . . . . . . . . . . . . . . .  19, 23, 36, 38, 43

CALJIC No. 5.30 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    19

CALJIC No. 5.50 . . . . . . . . . . . . . . . . . . . . . . . . . . .  19, 36, 37, 39, 40

CALJIC No. 5.51 . . . . . . . . . . . . . . . . . .  18, 19, 22, 28, 36, 38, 39, 40

CALJIC No. 5.52 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    19

CALJIC No. 5.54 . . . . . . . . . . . . . . . . . 19, 31, 32, 33, 36, 37, 39, 40

CALJIC No. 5.55 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

CALJIC No. 8.00 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

CALJIC No. 8.10 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

CALJIC No. 8.11 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

CALJIC No. 8.20 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

CALJIC No. 8.30 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

CALJIC No. 8.31 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

CALJIC No. 8.40 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

CALJIC No. 8.42 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

CALJIC No. 8.43 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

CALJIC No. 8.44 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

CALJIC No. 8.45 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

CALJIC No. 8.50 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

CALJIC No. 8.55 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

CALJIC No. 8.70 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

CALJIC No. 8.71 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

CALJIC No. 8.72 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

CALJIC No. 8.73 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

CALJIC No. 8.74 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

CALJIC No. 8.75 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

CALJIC No. 9.00 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    19

CALJIC No. 9.01 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    19

~~IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA~~

~~SIXTH APPELLATE DISTRICT~~

| | |
|---|---|
| ~~THE PEOPLE,~~ ) | |
| ) | No. H027008 |
| ~~Plaintiff and Respondent,~~ ) | |
| ) | (Super. Ct. No. BB256062) |
| v. ) | |
| ) | Santa Clara County |
| ~~RONALD PAUL McKEAN,~~ ) | |
| ) | |
| ~~Defendant and~~ Appellant. ) | |
| ─────────────────────── ) | |

## APPELLANT'S OPENING BRIEF

### STATEMENT OF APPEALABILITY

*Appellant*
~~Defendant~~ has appealed from a judgment of conviction entered against

him in a criminal action. Such a judgment is appealable pursuant to the

provisions of subdivision (a) of section 1237 of the Penal Code.

### STATEMENT OF THE CASE

On May 2, 2002, an information was filed in the Superior Court of

*Appellant*
Santa Clara County charging ~~defendant~~ Ronald Paul McKean with one count

of murder in violation of section 187 of the Penal Code; the information also

contained special, sentencing enhancement allegations stating that during the

*Appellant*
commission of the alleged murder ~~defendant~~ personally used a firearm within

the meaning of subdivision (a)(1) of section 12022.5 of the Penal Code, and

intentionally and personally discharged a firearm within the meaning of

1

subdivisions (b), (c) and (d) of section 12022.53 of the Penal Code. (Clerk's Transcript (hereinafter referred to as "C.T.") 131-134.)

On May 6, 2002, ~~defendant~~ *appellant* was arraigned upon the information, entered a plea of not guilty to the charge and denied all of the special allegations. (C.T. 136.)

On October 31, 2002, a 13 day jury trial commenced before Judge Diane Northway which resulted in a mistrial when, on November 22, 2002, the jury declared that it was unable to reach a verdict. (C.T. 227, 357, 363-364.)

On July 30, 2003, a 13 day jury retrial commenced before Judge Diane Northway. (C.T. 424, 552.)

On August 19, 2004, the jury returned a verdict finding ~~defendant~~ *appellant* guilty of second degree murder and finding to be true the special allegations that during the commission of the murder ~~defendant~~ *appellant* personally used a firearm within the meaning of subdivision (a)(1) of section 12022.5 of the Penal Code, and intentionally and personally discharged a firearm within the meaning of subdivision (d) of section 12022.53 of the Penal Code. (C.T. 547-552.)

On November 7, 2003, defendant filed a motion for new trial, or for a modification of the verdict, on the grounds that the prosecution failed to disclose exculpatory evidence and that the evidence was insufficient to support the verdict of second degree murder. (C.T. 564-644.)

On November 21, 2003, the prosecution filed a response to ~~defendant's~~ *appellant's*

2

motion for a new trial, or for a modification of the verdict. (C.T. 646-664.)

On December 12, 2003, a hearing was conducted before Judge Diane Northway on defendant's motion for a new trial, or for a modification of the verdict; at the conclusion of that hearing, the motion was denied in full. (C.T. 666.)

On January 14, 2004, ~~defendant~~ appellant filed a motion to strike the sentencing enhancement under subdivision (d) of section 12022.53 of the Penal Code (i.e., intentionally and personally discharging a firearm during the commission of the murder) on the grounds that the imposition of the punishment under that enhancement (i.e., 25 years to life in prison) constituted cruel and/or unusual punishment under the state and/or federal constitutions. (C.T. 667-704.)

On January 26, 2004, at the time scheduled for sentencing, a hearing was conducted before Judge Diane Northway on ~~defendant's~~ appellant's motion to strike the sentencing enhancement under subdivision (d) of section 12022.53 of the Penal Code; the motion to strike the sentencing enhancement was denied, after which defendant received a total state prison sentence of 40 years to life (i.e., 15 years to life for the second degree murder conviction, plus 25 years to life for the sentencing enhancement under subdivision (d) of section 12022.53 of the Penal Code); all other punishments for all other sentencing enhancements were stayed. (C.T. 721-723.)

On January 26, 2004, ~~defendant~~ appellant timely filed a notice of appeal from the

3

judgment entered against him. (C.T. 724.)

<u>STATEMENT OF THE FACTS</u>

Viewing the record in the light most favorable to the People, as one is required to do following a guilty verdict (<u>People v. Sweeney</u> (1960) 55 Cal.2d 27, 33), the facts are as follows:

In January 2002, a portion of the Trinity Lutheran Church on Middlefield Road in Palo Alto, California, was being used as an overnight homeless shelter. (Reporter's Transcript (hereinafter "R.T.") 141-142, 148, 270.) Sometime between approximately 6:10 A.M., and 6:20 A.M., on January 11, 2002, ~~defendant~~ appellant and one Joseph Carney, who were staying at that homeless shelter, got into an argument in the kitchen area adjacent to the space where the homeless residents slept at night. (R.T. 149-150, 218, 221-222, 552-553, 571, 573, 576.) ~~Defendant~~ appellant was five feet, eight inches tall and weighed 187 pounds. (R.T. 645-646.) Carney was five feet, ten inches tall and weighed 305 pounds. (R.T. 618.)

Carney and ~~defendant~~ appellant were arguing about defendant having thrown away some deodorant that had belonged to Carney. They also were arguing over defendant's "attitude." The argument was very loud. Carney and ~~defendant~~ appellant were very close to each other. (R.T. 149-150, 219, 552-553, 578.) As one witness described it, Carney and ~~defendant~~ appellant were "bellybutton to bellybutton." (R.T. 578.)

4

Both ~~defendant~~ *appellant* and Carney accused each other of having hit the other's nose. (R.T. 220.) However, none of the witnesses ever actually saw any punches thrown by either defendant or Carney. (R.T. 219, 578.) At one point ~~defendant~~ *appellant* apparently pointed his fingers at Carney. (R.T. 150.) Carney was visibly upset, and defendant was agitated, shaking and angry. (R.T. 150, 155, 553, 579.)

As the argument continued, Carney said words to the effect that if defendant felt "that way" then they should "take this" to a gym and "settle it like men." (R.T. 150.) As one witness heard it, Carney during the argument said, "I'll meet you anytime, any place. We can go to any gymnasium or place that you designate. And I'll be happy to satisfy your wishes. And we can put on the gloves and do this." (R.T. 557.) Another witness heard Carney say to defendant, "We should go out to the YMCA and settle this problem like men." (R.T. 220.) ~~Defendant~~ *appellant* replied by saying things such as, "What if I blow your fucking brains out," and "Why don't I just go out and get my gun and shoot you." (R.T. 150, 220.) Carney then apparently said, "Why don't we just go down there and finish this." (R.T. 220.) Defendant then replied, "Well, do you want me to kill you now or kill you later." (R.T. 220.)

At about that time during the argument, one Rason Shabazz, who was working at the shelter and who had witnessed a significant portion of the argument, intervened and told Carney to go outside and told ~~defendant~~ *appellant* to stay

5

inside. (R.T. 150-151, 221, 559-560, 581.) At that point the arguing stopped

and both ~~defendant~~ *appellant* and Carney temporarily went to the sleeping area near the

kitchen. (R.T. 150-151, 222-223.)

Approximately three to four minutes later, ~~defendant~~ *appellant* left the sleeping

area and walked out to his car that was parked in the church parking lot.

Carney, in the meantime, left the sleeping area too and walked across an open

courtyard to another building to use the men's bathroom at that building. (R.T.

151-152, 222-227, 581-582.)

Once ~~defendant~~ *appellant* got to his car, he removed from that car a nine-

millimeter Ruger semi-automatic pistol. ~~Defendant~~ *appellant* then went to the men's

bathroom to where Carney earlier had gone. ~~Defendant~~ *appellant* entered the bathroom

and at that location shot Carney one time in the chest at close range. This

shooting occurred anywhere from three to ten minutes after ~~defendant~~ *appellant* had left

the shelter sleeping area to go to his car. (R.T. 152-153, 227, 405, 560-561,

582, 621-626.)

Right after the shooting, ~~defendant~~ *appellant* walked out of the bathroom and

back toward his car. ~~Defendant~~ *appellant* was carrying his pistol in his right hand. (R.T.

153-154.) When ~~defendant~~ *appellant* got back to his car he removed the clip from the

gun, ejected a live round of ammunition from the chamber of the gun, locked

the slide of the gun back, and placed the gun and the clip on top of his car.

(R.T. 584, 681.)

Richard Farris, who also was a resident at the homeless shelter, had walked out to the front sidewalk on Middlefield Road, and while there he heard a loud bang. As Farris began to walk back to the kitchen area at the shelter, he heard ~~defendant~~ *appellant* asking him for a cigarette. Farris walked over to ~~defendant's~~ *appellant's* car and gave defendant a cigarette. At that point Farris saw the gun and the clip on the roof of defendant's car. (R.T. 582-584.) According to Farris, ~~defendant~~ *appellant* was not nervous, was not shaky and was not hysterical. (R.T. 582-584.) ~~Defendant~~ *appellant* lit the cigarette with no problems. Farris asked ~~defendant~~ *appellant* about the gun. ~~Defendant~~ *appellant* said it was a nine-millimeter handgun. Farris then started to figure out what had happened based upon hearing the earlier gunshot. Farris at that point had some "nervous laughter" in his voice. ~~Defendant~~ *appellant* then said to Farris, "Don't laugh. I shot him. I'll probably get 20 years." (R.T. 584-585.)

Moments later, in response to a 911 call made by Rason Shabazz, a number of officers from the Palo Alto Police Department arrived in the area of the Trinity Lutheran Church. (R.T. 155, 269-270, 327, 345-347, 378.) At that point ~~defendant~~ *appellant* was standing approximately 20 feet in front of his vehicle, a blue stationwagen. As Officer Daniel Ryan of the Palo Alto Police Department approached ~~defendant, defendant~~ *appellant, appellant* had his hands stretched out with his palms facing the officer. Officer Ryan located the gun and the clip on top of defendant's car. (R.T. 270-272.) As Officer Ryan was talking with some

7

other officers as to the "limits" of the crime scene and what areas they would need to cordon off for evidentiary purposes, ~~defendant~~ appellant said, "Don't worry. It's all in the bathroom." (R.T. 272.)

At around that same time paramedics arrived on the scene to render aid to Carney. Eventually, Carney was transported to the emergency room at Stanford Hospital, and approximately an hour later he was pronounced dead at 7:24 A.M. (R.T. 353-354.)

According to Dr. Gregory Schmunk, the then chief medical examiner for the Coroner's Office of Santa Clara County, the cause of Carney's death was a single gunshot wound to the chest. According to Dr. Schmunk, a single bullet entered Carney's lungs, his liver and then his spinal cord. The bullet ultimately came to rest in some muscle in Carney's back. (R.T. 613, 625-627.) Based upon the physical evidence, it was Dr. Schmunk's opinion that Carney had been shot when the barrel of the firearm was within one to two inches of Carney's chest. It also was Dr. Schmunk's opinion that Carney was not moving forward when the gun was fired at Carney. (R.T. 629-632.)

## THE DEFENSE

~~Defendant~~ appellant, who was 49 years old at the time of trial, had been homeless for about 10 months prior to January 2002. During that 10 month period, ~~defendant~~ appellant, who was a veteran of the United States Air Force, was in an in-patient program at the Veteran's Administration Hospital in Palo Alto from

8

August 21, 2001, to September 5, 2001. When discharged from that in-patient program, ~~defendant~~ *appellant* had a major depressive disorder. ~~Defendant~~ *appellant* then participated for approximately 30 days in the Homeless Veteran's Out-Patient Rehabilitation Program for his depressive disorder. By the time ~~defendant~~ *appellant* completed that out-patient program, his depressive disorder was designated as a dyshymic disorder, which means that one is having depression for "more days than not." (R.T. 457-465, 644-646.)

According to Dr. Bruce Linenberg, a psychologist at the Veteran's Administration Hospital, someone similar to ~~defendant~~ *appellant* still would be struggling with their dyshymic disorder two or three months after their discharge from an out-patient program. Also, according to Dr. Linenberg, ~~defendant~~ *appellant* suffered from a personality disorder with avoidant and paranoid traits. As explained by the doctor, apparently the paranoid trait would involve perceiving other's motives as monovalent, and the avoidant trait would involve a very low self-esteem. (R.T. 467-471.) Furthermore, according to Dr. Linenberg, two or three months after discharge from the out-patient program, one such as ~~defendant~~ *appellant*, would probably still be struggling with the personality disorders in question. (R.T. 470-471.)

Furthermore, according to Dr. Linenberg, one who has a dyshymic disorder could have difficulties with, among other things, cognition, interpersonal functioning and impulse control. With regard to impulse control

problems, one would tend to act first and think later. (R.T. 464-467.) Such

people, according to Dr. Linenberg, would have difficulties handling stress and

distress. (R.T. 467.)

~~Defendant~~ *appellant* had been staying at the homeless shelter at the Trinity

Lutheran Church since January 2, 2002, when that church was opened for use

as a shelter. (R.T. 646-647.) As part of staying at the shelter, ~~defendant~~ *appellant* had

an assignment to do chores around the area of the church being used as a

shelter. ~~Defendant~~ *appellant's* assignment was to cleanup the men's bathroom in the

mornings. Apparently on the morning of January 10, 2002, the individual

running the shelter, Rason Shabazz, had specifically asked ~~defendant~~ *appellant* to

cleanup a toiletry item, some deodorant, that was on top of a toilet paper

dispenser in the men's bathroom. ~~Defendant~~ *appellant* was also asked to empty some

trash that was in that bathroom. ~~Defendant~~ *appellant* followed these instructions and

threw the deodorant away. (R.T. 647-649, 652.)

Then, on the morning of January 11, 2002, ~~defendant~~ *appellant* woke up at about

6:00 A.M. ~~Defendant~~ *appellant* put on some clothes, sat around in the sleeping area at

the shelter for about five minutes, and then went through the kitchen area

toward a coed bathroom adjacent to the kitchen. The door to the coed

bathroom was closed, and ~~defendant~~ *appellant* thought that someone was inside.

~~Defendant~~ *appellant* stood outside the door for a little while. Eventually, Joseph Carney

opened the door and came out of the coed bathroom. Apparently, due to the

10

smell emanating from inside that bathroom, defendant turned around and

decided to use another bathroom. (R.T. 649-651.)

After ~~defendant~~ [appellant] had turned around, Carney asked ~~defendant~~ [appellant] if

~~defendant~~ [appellant] had seen any deodorant. ~~Defendant~~ [appellant] turned and faced Carney and

said that he threw some deodorant away "yesterday morning." (R.T. 651-652.)

Carney was not happy since ~~defendant~~ [appellant] had thrown away Carney's deodorant.

~~Defendant~~ [appellant] told Carney that he (defendant) was following orders and Carney

only had himself to blame. (R.T. 652.)

Carney then "jammed" ~~defendant~~ [appellant] up against some kitchen cabinets.

Carney then cocked a fist back. ~~Defendant~~ [appellant] leaned back, turned his head and

made a sweeping motion with his left hand in order to deflect a potential

oncoming punch.  However, no contact was made between Carney and

~~defendant~~ [appellant].  Carney cursed at ~~defendant~~ [appellant] and complained of ~~defendant~~ [appellant] having

a holier than thou attitude and a self-righteous attitude. (R.T. 652-654.)

~~Defendant~~ [appellant] was stunned and at that point was a "little mad." (R.T. 655.)

~~Defendant~~ [appellant] tried to squeeze out from the area where he was by the cabinets.

Carney followed ~~defendant~~ [appellant] and said, "You're not going anywhere."  (R.T.

655.) Carney continued to argue about his missing deodorant and ~~defendant's~~ [appellant's]

attitude.  Carney used his weight to keep ~~defendant~~ [appellant] cornered and off balance.

At that point ~~defendant~~ [appellant] was afraid. (R.T. 656.)

After several more minutes of argument back and forth between

*appellant*

~~defendant~~ and Carney, Rason Shabazz came into the kitchen and said, "Hey,

take it outside." (R.T. 658.) Shabazz asked what was happening. Carney

*appellant*

backed off and said that ~~defendant~~ had thrown his (Carney's) deodorant away.

*appellant*

Shabazz told Carney that he (Shabazz) had directed ~~defendant~~ to throw the

deodorant away. Carney then said to Shabazz, "I don't have a problem with

you." Then Carney went on to say, however, that he had had it "up to here"

*appellant*

with ~~defendant~~. Carney again complained that he did not like defendant's self-

righteous attitude. (R.T. 658-659.) At around this time Carney said that he

*appellant's*

wanted to kick ~~defendant's~~ ass, and defendant said that he wanted to kick

Carney's ass. (R.T. 658.)

*appellant*

~~Defendant~~, who had a ruptured bicep and a ruptured Achilles tendon,

really did not want to fight Carney. (R.T. 642-643, 660.) Then, at one point

Carney said words to the effect that they should settle "this" at a gym and that

*appellant*

they should put on gloves and settle "this" like men. ~~Defendant~~ thought this

*appellant*

was ridiculous due to their age and the fact that ~~defendant~~ himself had never

*appellant*

boxed before. ~~Defendant~~ continued to be afraid of Carney. (R.T. 662-663.)

*appellant*

~~Defendant~~ found himself anxious, nervous, fearful, trapped and jittery.

*appellant*                                                                 *appellant*

~~Defendant~~ was shaking and felt that the situation was very stressful. ~~Defendant~~

believed that he was not handling the stress well. (R.T. 664.) Then, wanting

Carney to think about how ridiculous the whole situation was at that point,

*appellant*

~~defendant~~, as an apparent overstatement and not really wanting to do so, told

12

Carney, "How about I shoot you in the head." (R.T. 663-664.)

At that point, Shabazz told Carney to go outside and told ~~defendant~~ *appellant* to go into the sleeping area. However, both Carney and ~~defendant~~ *appellant* went into the sleeping area. As ~~defendant~~ *appellant* passed by Carney to get to his (~~defendant's~~ *appellant's*) sleeping bag and blanket, Carney said in a threatening manner, "I walk softly and carry a big stick." ~~Defendant~~ *appellants* felt threatened by that comment. (R.T. 664-666.)

~~Defendant~~ *appellant* stayed in the sleeping area for about one to two minutes thinking whether he should leave the shelter but knowing that he had no place to go. During this time, ~~defendant~~ *appellant* did not see Carney leave the sleeping area. ~~Defendant~~ *appellant* then rolled up his sleeping bag and went out to his car in the parking lot to get his razor to shave. When ~~defendant~~ *appellant* was at his car, he also got his pistol from his car. ~~Defendant~~ *appellant* previously had purchased this pistol in Redwood City at a gun store on December 8, 2001, for purposes of work as a security guard. Other security guard equipment, such as utility belt and mag light, were in defendant's car at that time. (R.T. 667-670.)

As ~~defendant~~ *appellant* was retrieving the pistol, ~~defendant~~ *appellant* felt that he needed a deterrence from an attack he expected to come from Carney. ~~Defendant~~ *appellant* put his pistol in his back pocket but did so without ever intending to shoot Carney. ~~Defendant~~ *appellant* then got all of his shaving gear together and went to the men's bathroom across the courtyard from the sleeping area in order to avoid Carney.

13

At that point in time, ~~defendant~~ [appellant] thought Carney was in the sleeping area building across the courtyard from the men's bathroom. (R.T. 670-672.)

When ~~defendant~~ [appellant] got to the men's bathroom, the outer door to the bathroom was open. When ~~defendant~~ [appellant] got to the inner door of the bathroom he saw Carney at a sink in the bathroom. Carney's shirt was off and Carney's back was to ~~defendant~~ [appellant]. ~~Defendant~~ [appellant] believed that at this point it was approximately 6:15 A.M. (R.T. 671-673.)

Carney turned around completely and faced ~~defendant~~ [appellant]. Carney took two steps toward ~~defendant~~ [appellant]. Carney was now only a few feet from ~~defendant~~ [appellant]. ~~Defendant~~ [appellant] took the gun out of his back pocket and said, "Don't fuck with me anymore." (R.T. 673-674.) ~~Defendant~~ [appellant] had the gun in his right hand, near his own head and pointed it toward the ceiling. ~~Defendant~~ [appellant] displayed the gun in order to deter Carney. (R.T. 674.) Carney walked right up to ~~defendant~~ [appellant] in an intimidating manner and asked ~~defendant~~ [appellant] if he (~~defendant~~ [appellant]) were going to shoot him. Carney went on to say, "Go ahead and shoot. I'm not afraid to die. I'm not afraid of you." ~~Defendant~~ [appellant] told Carney a couple of times that he did not want to shoot him (Carney). ~~Defendant~~ [appellant] then lowered his gun, put his finger on the trigger, put his thumb on the safety to the gun and took the safety off. Carney then used his left hand to grab the barrel or slide of the gun. Carney then pulled the gun to his own chest and continued to say that he was not afraid to die. Carney then went on to say that he was not afraid of ~~defendant~~ [appellant]

14

and the he (Carney) would "rather be up there." As Carney said those words

he pointed up toward heaven. (R.T. 674-675.)

At that point ~~defendant~~ appellant thought to himself, "Oh shit, what am I going

to do." ~~Defendant~~ appellant realized that he was having another confrontation with

Carney and that there was no way that he could win. (R.T. 676.) ~~Defendant~~ appellant

also thought that Carney was going to take the gun away from him and use it

on ~~defendant~~ appellant. ~~Defendant~~ appellant's hand was shaking. Carney had a good grip on the

gun. ~~Defendant~~ appellant was thinking how to try to defuse the situation. However,

~~defendant~~ appellant could not concentrate. ~~Defendant~~ appellant had not calmed down since the

earlier argument in the kitchen area between himself and Carney. ~~Defendant~~ appellant

was not thinking clearly and his mind was racing. (R.T. 676-677.)

Carney then said to ~~defendant~~ appellant, "If you're not going to shoot me, put the

gun down." (R.T. 677.) After being in the bathroom for about two minutes

with Carney holding onto the gun, Carney finally let the gun go and ~~defendant~~ appellant

lowered it to his side, put the safety on and edged backwards. ~~Defendant~~ appellant did

not turn around for his own safety. (R.T. 677.) ~~Defendant~~ appellant was now in the

little hallway between the outer door and the inner door to the bathroom.

Carney was still actually in the bathroom. ~~Defendant~~ appellant continued to edge

backward toward the outer door to the bathroom. ~~Defendant~~ appellant got within a

couple of feet of the outer door to the bathroom when Carney said that

~~defendant~~ appellant was not the only one with a gun and that he (Carney) had a Beretta

nine-millimeter in storage. ~~Defendant~~ [appellant] did not know what Carney meant by "storage." ~~Defendant~~ [appellant] did not know whether it meant the nine-millimeter Beretta was in storage back in the sleeping area at the homeless shelter across the courtyard or whether it was in some sort of public storage. (R.T. 678.)

Carney then began cursing and said that he wanted to get away from "assholes like you." ~~Defendant~~ [appellant] did not say anything. At this point there was approximately five feet between ~~defendant~~ [appellant] and Carney. Carney then lunged toward ~~defendant~~ [appellant] with his hands at shoulder height in a clenching grip posture. ~~Defendant~~ [appellant] turned his body and got his neck out of the way. ~~Defendant~~ [appellant] brought his gun up, took off the safety and pulled the trigger once. (R.T. 678-679.) When ~~defendant~~ [appellant] pulled the trigger, he felt the gun jerk. However, ~~defendant~~ [appellant] did not know whether the jerking of the gun had been caused by Carney running into the gun. Carney never made contact with ~~defendant's~~ [appellant's] throat. After firing the gun, ~~defendant~~ [appellant] looked back and saw Carney on the ground on his back. ~~Defendant~~ [appellant] saw a hole in Carney's chest and saw two splatters of blood on the tile floor in the bathroom. (R.T. 678-679.)

While still apparently standing at the same location from where he had fired the gun, ~~defendant~~ [appellant] could hear Carney gasping for breath and he could hear people congregating outside. ~~Defendant~~ [appellant] thought to himself whether he should perform CPR on Carney. However, ~~defendant~~ [appellant] could hear Carney breathing and thought Carney did not need CPR at that time. ~~Defendant~~ [appellant] was

16

in shock and really did not know what to do. ~~Defendant~~ *appellant* finally thought that

the best thing would be for him to leave so that when the paramedics came

they would help Carney since paramedics would not help someone with

another person standing there with a gun. ~~Defendant~~ *appellant* then turned around and

walked outside. (R.T. 680.)

 As ~~defendant~~ *appellant* went out of the bathroom he saw Shabazz and two women

nearby. ~~Defendant~~ *appellant* was speechless and did not say anything to Shabazz. (R.T.

680-681.) ~~Defendant~~ *appellant* then walked back to his car. When ~~defendant~~ *appellant* was almost

at his car, ~~defendant~~ *appellant* dropped the clip out of the gun, ejected the round of

ammunition in the chamber and locked the slide of the gun back. ~~Defendant~~ *appellant*

then placed the gun and the clip on top of his car. ~~Defendant~~ *appellant* then opened the

back hatchback of his car and tossed into the back of his car his shaving gear.

(R.T. 681.)

 About two minutes later, ~~defendant~~ *appellant* saw Richard Farris walking in the

area. ~~Defendant~~ *appellant* asked Farris for a cigarette in order to calm down. ~~Defendant~~ *appellant*

lit up the cigarette. Farris asked ~~defendant~~ *appellant* what was the noise that he (Farris)

had heard. ~~Defendant~~ *appellant* said that he had just shot "him." Farris chuckled.

~~Defendant~~ *appellant* then said that it was not funny and that he was not trying to make

a joke. (R.T. 682-683.) Farris then asked if the gun on top of the car was a BB

gun. ~~Defendant~~ *appellant* responded in the negative and said that it was nine-millimeter.

~~Defendant~~ *appellant* then looked at the cigarette he was smoking and said words to the

effect that this was probably his last cigarette for about 20 years.  (R.T 682.683.)

~~Defendant~~ *appellant* was abundantly clear in his testimony that he never intended to kill Carney when he (defendant) went to his car to get the gun. (R.T. 683.)

<u>DISCUSSION</u>

1.    <u>Improper Instructions that Diluted the Law of Self-Defense and Imperfect Self-Defense</u>:

It is ~~defendant~~ *appellant*'s position that the trial court committed prejudicial error in its instructions with regard to the principles of self-defense and imperfect self-defense when the trial court gave a group of instructions which, in essence, effectively told the jury that for ~~defendant~~ *appellant* to be able to claim self-defense in this case, the ultimate victim (Carney) must have, at a minimum, first committed the criminal offense of assault upon ~~defendant~~ *appellant*, and for ~~defendant~~ *appellant* to be able to claim imperfect self-defense, the ultimate victim must have first committed an act upon ~~defendant~~ *appellant* that would be an imminent peril to defendant's life or would imminently cause great bodily injury to ~~defendant~~ *appellant*. As will be developed hereinbelow, the reason why this group of instructions was erroneous is that actual danger from the victim is not necessary to justify the application of the self-defense doctrine; all that is necessary is that ~~defendant~~ *appellant* actually believed in that danger and there is a reasonable basis for that belief. (See CALJIC Nos. 5.12, 5.51.)  Furthermore, actual danger from the victim is not necessary to justify the application of the imperfect self-

18

defense doctrine; all that is necessary is an appearance of danger that is actually believed by ~~defendant.~~ *appellant* (See CALJIC No. 5.17.)

Preliminarily, in this case, the trial court gave a full panoply of instructions on the principles of self-defense and imperfect self-defense. Specifically, the trial court instructed the jury on justifiable homicide in self-defense (CALJIC No. 5.12), the burden of proof with regard to such self-defense (CALJIC No. 5.15), self-defense against assault (CALJIC No. 5.30), an assaulted person need not retreat (CALJIC No. 5.50), actual danger is not necessary (CALJIC No. 5.51), the right to self-defense ceases when the danger ceases (CALJIC No. 5.52), the right to self-defense by an initial aggressor (CALJIC No. 5.54), the right to self-defense may not be contrived (CALJIC No. 5.55), and an actual, but unreasonable, belief of self-defense can be voluntary manslaughter (i.e., imperfect self-defense) (CALJIC No. 5.17). (R.T. 975-977, 978-979; C.T. 324-327, 330-335.)

However, what happened in this case is that immediately after the trial court instructed the jury on the principles concerning self-defense against an assault as contained in CALJIC No. 5.30 (R.T. 976-977; C.T. 327), the trial court proceeded to instruct the jury on the standard definition for the crime of assault as appearing in CALJIC No. 9.00 and CALJIC No. 9.01 (R.T. 977-978; C.T. 328-330).

With regard to the problem in issue what the trial court initially said

was as follows: "It is lawful for a person who is being <u>assaulted</u> to defend himself from attack if, as a reasonable person, he has grounds for believing, and does believe, that bodily injury is about to be inflicted on him. In doing so, the person may use all force and means which he believes to be reasonably necessary, and which would appear to a reasonable person in the same or similar circumstances to be necessary, to prevent the injury which appears to be imminent." (Emphasis added.) (R.T. 976-977; C.T. 327.)   However, immediately following this instruction on the principle of self-defense, which used the word "assaulted," the trial court proceeded to give the standard definition for the crime of assault. That rather lengthy standard definition of what constitutes the crime of assault went as follows:

> "In order to prove an assault, each of the following elements must be proved: One, a person willfully and unlawfully committed an act which by its nature would probably and directly result in the application of physical force on another person. Two, the person committing the act was aware of the facts that would lead a reasonable person to realize that as a direct and natural and probable result of this act that physical force would be applied to another person. And, three, at the time the act is committed, the person committing the act had the present ability to apply physical force to the other person.

> "The word willfully means that the person committing the act did so intentionally. However, an assault does not require an intent to cause injury to another person or an actual awareness of the risk that injury might occur to another person.

> "To constitute an assault, it is not necessary that any actual injury be inflicted. However, if an injury is inflicted, it may be considered in connection with other evidence in determining whether an assault was committed. A willful

> application of physical force upon the person of another is not unlawful when done in lawful self-defense.
>
> "A necessary element of an assault is that the person committing the assault had the present ability to apply physical force to the person of another. This means that, at the time of the act which by its nature would probably and directly result in the application of physical force upon the person of another, the perpetrator of the act must have the physical means to accomplish the result - - that result. If there is this ability, present ability exists even if there is no injury." (R.T. 977-978; C.T. 328-330.)

By including in its instructions to the jury the standard definition for the crime of assault, right after the standard jury instruction on self-defense against an assault, what the trial court did was to tell the jury that in order for the defense of self-defense to be applicable, it must be proved that the victim first committed the crime of assault upon ~~defendant~~ appellant. More specifically, the instruction on self-defense against assault talked about how it was lawful for a person who was being "assaulted" to defend himself from an attack. Then, the trial court defined the concept of "assault," and stated that for there to be an assault a number of elements had to be proved. Those elements included that a person (i.e., in this case the ultimate victim) willfully and lawfully committed an act which by its nature would probably and directly result in the application of physical force on another person (i.e., in this case ~~defendant~~ appellant); that at the time the act was committed, the person (i.e., in this case the ultimate victim) intended to use physical force upon another person (i.e., in this case ~~defendant~~ appellant) or to do an act that was substantially certain to result in the

21

application of physical force upon another person (i.e., in this case, ~~defendant~~ *appellant*);

and that at the time the act was committed, the person (i.e., in this case the

ultimate victim) had the present ability to apply physical force to the person of

another (i.e., in this case ~~defendant~~ *appellant*).

All of the above-discussed instructions clearly and unequivocally

suggested to the jury that in order for ~~defendant~~ *appellant* to be able to claim self-

defense in this matter, it was necessary first to prove that the ultimate victim

committed a full and complete criminal assault upon ~~defendant~~ *"appellant*, including the

fact that the ultimate victim intended to use physical force upon another person

or to do an act that was substantially certain to result in the application of

physical force upon another person. This idea that the concept of self-defense

is only applicable if there is proof that the ultimate victim committed the actual

crime of assault, finds no basis whatsoever in the law of self-defense in this

state.

It is well settled in this state that with regard to the principles of self-

defense, actual danger (i.e., an actual assaultive type crime being committed

by the ultimate victim upon the ~~defendant~~ *appellant*) is not necessary as long as there is

a reasonably apparent danger. (See People v. Wyatt (1972) 22 Cal.App.3d

671, 679; People v. Garcia (1969) 275 Cal.App.2d 517, 522; People v. Jackson

(1965) 233 Cal.App.2d 639, 641-643; People v. Collins (1961) 189

Cal.App.2d 575, 588; see also CALJIC No. 5.51.) As the Court of Appeal said

in People v. Dawson (1948) 88 Cal.App.2d 85, 96, ". . . it does not matter whether such danger was real or apparent. [Citations.] If [a] defendant acted from reasonable and honest convictions he [or she] cannot be held criminally responsible for a mistake in the actual extent of the danger, when other reasonable men [or women] would alike have been mistaken." (Accord People v. Jackson, supra, 233 Cal.App.2d 639, 642.)

Accordingly, it was error for the trial court to interject into its instructions on self-defense the concept that there needs to be proof of an actual assault, with all of its necessary elements, being committed by the victim (in this case Joseph Carney) before the defense of self-defense would be available to ~~defendant~~ appellant.

Although the instruction on imperfect self-defense did not contain the word "assault" (R.T. 976; C.T. 520; see also CALJIC No. 5.17), the error in issue also infected that instruction. First, the instruction on imperfect self-defense required ~~defendant~~ appellant to believe in "imminent peril to life or great bodily injury." Second, the improper instruction on the standard definition of assault required the alleged victim to have committed "an act which by its nature would probably and directly result in the application of physical force" upon ~~defendant~~ appellant. Third, as discussed hereinabove, the jury was effectively told that in connection with the defense of self-defense the ultimate victim (in this case Carney) had to have committed the crime of assault before the defense of self-

23

defense would be available to ~~defendant~~ appellant.    Considering all three of these

instructions as a whole, it would be logical and very easy for the jury to believe

that imperfect self-defense would not be available to defendant unless the

ultimate victim (in this case Carney) initially committed against ~~defendant~~ appellant an

act which by its nature would probably and directly result in the application of

physical force that was an imminent peril to the life of ~~defendant~~ appellant, or would

probably and directly result in great bodily injury to ~~defendant~~ appellant.    Obviously,

that would be a completely improper understanding of the law of imperfect

self-defense, but that is exactly what the erroneous instructions in issue easily

could have lead the jury to believe was the law in this case.

Furthermore, what complicates the error in question, both as to the

principles of self-defense and imperfect self-defense, is that the trial court in

defining the specific elements of the crime of assault said it was necessary for

such elements to be "proved." (R.T. 977; C.T. 328.) This suggests that

someone, apparently the beneficiary of the defense of self-defense and

imperfect self-defense (i.e., the defendant), must "prove" that the some actual

crime of an assaultive nature (for self-defense an assault, and for imperfect

self-defense an act of imminent peril to life or one that imminently would

cause great bodily injury) was being committed by the ultimate victim upon the

~~defendant~~ appellant before the ~~defendant~~ appellant could claim self-defense or imperfect self-

defense.  This type of language, of a burden to prove something being put

24

*appellant*

upon a ~~defendant~~, is contrary to well established law that it is the prosecution's obligation, when the defense of self-defense, and the mitigating concept of imperfect self-defense, are raised, to prove beyond a reasonable doubt the absence thereof. (See <u>People v. Pineiro</u> (1982) 129 Cal.App.3d 915, 920; <u>People v. Banks</u> (1976) 67 Cal.App.3d 379, 384; see also <u>People v. Cornett</u> (1948) 33 Cal.2d 33, 44; CALJIC No. 5.15.)

Additionally, what also complicates the error in issue is that at one point in defining the elements of the crime of assault, the trial court told the jury that "[a] willful application of physical force upon the person of another is not unlawful when done in lawful self-defense." (R.T. 977; C.T. 328.) By putting this latter self-defense concept into the erroneous instructions in question, the trial court interjected the idea that if the ultimate victim in this matter were somehow acting in self-defense himself, then that person's conduct would not constitute the crime of assault. In turn, this would suggest to the jury, under the instructions given, that defendant would be <u>unlawfully</u> defending himself from an assault if the ultimate victim were acting in self-defense.

To superimpose into the instructions in this case a concept that ~~defendant~~ *appellant* could not be lawfully acting in self-defense if there were evidence to show that the victim might be acting in self-defense clearly misstates the applicable law on self-defense and also erroneously distorts the law of imperfect self-defense. Again, as has been discussed thoroughly hereinabove,

25

the central focus of the defense of self-defense, from a ~~defendant's~~ appellant's perspective, is what is reasonably apparent and not what is real or actual. As to the mitigating concept of imperfect self-defense, the central focus thereof, from a ~~defendant's~~ appellant's perspective, is what is actually believed by the ~~defendant~~ appellant. Whether or not the ultimate victim may have been acting in self-defense is legally irrelevant to both self-defense and imperfect self-defense.

The only remaining issue is whether the above-discussed errors of interjecting into the principles of self-defense the concept of the ultimate victim committing an assault upon the ~~defendant~~ appellant, and interjecting into the principles of imperfect self-defense the concept of the ultimate victim committing upon the ~~defendant~~ appellant an act of imminent peril to life or one that imminently would cause great bodily injury, constituted prejudicial error in this case.

First, it is ~~defendant's~~ appellant's position that the instructional errors in issue created a serious structural defect in the overall fundamental fairness of ~~defendant's~~ appellant's trial. A major part of ~~defendant's~~ appellant's case was his actual belief that he had to defend himself from Carney. This formed part of the basis for ~~defendant's~~ appellant's reliance upon the defense of self-defense, and formed the basis for ~~defendant's~~ appellant's reliance upon the mitigating concept of imperfect self-defense.

Nevertheless, the instructional errors in issue evaporated a significant part of self-defense and imperfect self-defense by telling the jury (a) that if the

26

ultimate victim in this matter (Carney) was not engaging in an actual criminal

assault then self-defense would not available to ~~defendant,~~ *appellate* (b) that ~~defendant,~~ *appellate*

to claim the defense of self-defense, had to prove that Carney was engaging in

an actual criminal assault, (c) that if the ultimate victim in this matter (Carney)

was not engaging in an act of imminent peril to life or one that imminently

would cause great bodily injury then imperfect self-defense would not

available to ~~defendant,~~ *appellant* (d) that ~~defendant,~~ *appellant* to claim imperfect self-defense, had

to prove that Carney was engaging in an actual act that was of imminent peril

to ~~defendant's~~ *appellant's* life or was about to cause great bodily injury to ~~defendant,~~ *appellant* and

(e) that if Carney were acting in self-defense, then ~~defendant~~ *appellant* could not claim

self-defense or imperfect self-defense.  Such concepts are so fundamentally

wrong that, as a result thereof, there was such a structural defect in the

fundamental fairness of ~~defendant's~~ *appellant's* trial on critical defensive matters of an

instructional nature that both federal and state constitutional principles of due

process of law mandate that the error is prejudicial unless it can be determined

by other properly given instructions that the jury resolved against ~~defendant~~ *appellant* all

of the issues otherwise tainted by the erroneous instructions in question.  (See

People v. Flood (1998) 18 Cal.4th 470, 503, including fn. 20; People v.

Cummings (1993) 4 Cal.4th 1233, 1315.)  No such other legitimate and

properly given instructions exist in this case.[1]  Therefore, the instructional

errors in question were prejudicial.

Second, if the instructional errors in question do not cause a structural

defect going to the overall fundamental fairness of ~~defendant's~~ *appellant's* trial, then, as

to the effect those errors had on the true defense of self-defense, the errors at

a minimum have to be judged by the federal constitutional standard of

harmless error articulated in <u>Chapman v. California</u> (1967) 386 U.S. 18, 24 [17

L.Ed.2d 705] [harmless beyond a reasonable doubt]. (<u>People v. Quach</u> (2004)

116 Cal.App.4th 294, 303.)  On the other hand, as to the effect those errors

---

1.  In making this claim, ~~defendant~~ *appellant* realizes that at one point the trial court instructed the jury in the language of CALJIC No. 5.51 that in connection with the defense of self-defense actual danger is not necessary to justify self-defense and that a reasonable appearance of danger is all that is necessary for claiming the right of self-defense. (R.T. 978-979; C.T. 526.) However, at best, this instruction contradicted the erroneous instructions in issue which in effect said that the ultimate victim had to be engaging in an actual assault before defendant could validly claim self-defense and that the ultimate victim had to be engaging in an act that was of imminent peril to ~~defendant's~~ *appellant's* life, or about to cause ~~defendant~~ *appellant* great bodily injury, before ~~defendant~~ *appellant* could validly claim imperfect self-defense.   Under such circumstances, as the United States Supreme Court explained in <u>Francis v. Franklin</u> (1985) 471 U.S. 307, 322 [85 L.Ed.2d 344], with regard to a constitutionally infirm instruction, "[n]othing in these specific sentences or in the charge as a whole makes clear to the jury that one of these contradictory instructions carries more weight than the other.  Language that merely contradicts and does not explain a constitutionally infirm instruction will not suffice to absolve the infirmity.  A reviewing court has no way of knowing which of the two irreconcilable instructions the jurors applied in reaching their verdict." (Fn. omitted.) (See also <u>People v. Cornett</u>, <u>supra</u>, 33 Cal.2d 33, 41, where the California Supreme Court said, "[w]here it is impossible to determine which of inconsistent instructions were followed by the jury, conflicting instructions have been held to constitute reversible error.")

had on the mitigating concept of imperfect self-defense, the errors would be judged by the state standard of harmless error articulated in <u>People v. Watson</u> (1956) 46 Cal.2d 818, 836 [reasonably probable that the ~~defendant~~ *appellant* would have obtained a more favorable outcome]. (<u>People v. Breverman</u> (1998) 19 Cal.4th 142, 164-178.)  Under both standards the errors were not harmless.

The evidence against ~~defendant~~ *appellant* for second degree murder was not overwhelming.  Other than ~~defendant~~ *appellant* there were no eyewitnesses to the actual shooting who testified at trial.  Based upon the testimony of the medical examiner, that at the time of the shot the victim was standing still or moving backward, the jury may have believed that there was no actual assaultive type act being committed by Carney at that precise moment which constituted a simple criminal assault, an act of imminent peril to ~~defendant's~~ *appellant's* life or an act that imminently exposed ~~defendant~~ *appellant* to great bodily injury.  Under the erroneous instructions given, the jury at that point would have rejected in full ~~defendant's~~ *appellant's* claims of self-defense and imperfect self-defense.   However, that is not the law.

In spite of the testimony of the medical examiner, the jury could still have easily believed that at the time of the shooting ~~defendant~~ *appellant* actual believed in serious imminent harm from Carney and that it was reasonable for ~~defendant~~ *appellant* to believe those facts, even though Carney may have for a moment stood still, since ~~defendant~~ *appellant* himself explained that as Carney lunged toward ~~defendant~~ *appellant*

with his hands at shoulder height in a clenching grip posture, ~~defendant~~ [appellant] turned

his body, got his neck out of the way, fired the gun and apparently did not

actually observe Carney at the time of the shot. All of this would have been

a legitimate basis for self-defense, or alternatively, would have been a

legitimate basis for imperfect self-defense if a belief of serious imminent harm

was not reasonable. Furthermore, ~~defendant's~~ [appellant's] first trial resulted in a mistrial

when the jury was unable to reach a verdict. (C.T. 363-364.) The augmented

record on appeal includes a reporter's transcript of the jury instructions read

to the first jury and all of the arguments of counsel to that first jury.

(Augmented R.T. 432-582.) Self-defense and imperfect self-defense were part

of the theories at that first trial. (C.T. 324-335.) Twelve reasonable people

could not unanimously agree beyond a reasonable doubt to reject ~~defendant's~~ [appellant's]

claims of self-defense and imperfect self-defense. Based upon all of the above

circumstances, the instructional errors in question were not harmless under

either the <u>Chapman</u> standard or the <u>Watson</u> standard.

2.    <u>Erroneously Incomplete Instructions on the Legal Concept of Self-Defense by an Aggressor:</u>

It is ~~defendant's~~ [appellant's] position that the trial court committed prejudicial error

by giving an instruction to the jury on the availability of self-defense by the

initial aggressor which failed to contain the proviso that some or all of the

requirements that would make self-defense available to an initial aggressor can

be excused if the counterattack by the ultimate victim is so sudden and perilous

that the initial aggressor cannot withdraw.

In this case, the trial court gave the standard CALJIC instruction on the right to self-defense by an aggressor as it appeared in the Sixth and Seventh Editions of the CALJIC instructions. This instruction (CALJIC No. 5.54) in substance told the jury that the right to self-defense by the initial aggressor is available only after, among other things, the initial aggressor has clearly informed the other person that he or she wants to stopped fighting, and the initial aggressor has clearly informed the other person that he or she has stopped fighting.[2]

However, what the instruction in question failed to include was the rule of law that the initial aggressor can be excused from the various withdrawal requirements if "'. . . the attack is so sudden and perilous that he cannot withdraw.'" (People v. Quach, supra, 116 Cal.App.4th 294, 302; accord People v. Sawyer (1967) 256 Cal.App.2d 66, 75, fn. 2.) Stated in another manner, where the counterattack is so sudden and perilous that no opportunity is given to decline further to fight and one cannot retreat with safety, then the initial attacker is justified in slaying in self-defense. (People v. Gleghorn (1987) 193

---

2. As read to the jury, the instruction in issue said, "[t]he right of self-defense is only available to a person who initiated the assault if he has done all the following . . . number one, he has actually tried in good faith to refuse to continue fighting. Two, he has clearly informed his opponent that he wants to stop fighting. Three . . . he has clearly informed his opponent that he has stopped fighting. After he has done these three things, he has the right to self-defense if his opponent continues the fight." (R.T. 979; C.T. 528.)

Cal.App.3d 196, 201.)

The above-discussed proviso is fully applicable to this case. Under defendant's version of the events, defendant could have been construed as the initial aggressor when, near or at the inner door to the bathroom, defendant pulled out the gun from his back pocket once Carney turned around. Based upon what occurred thereafter the jury, following the precise language of CALJIC 5.54, which literally set out an absolute requirement of successful notification of a declination to continue the fight, could only have believed that ~~defendant,~~ *appellant,* by merely walking backward toward the outer door of the bathroom with the gun still his hand, had failed to give Carney adequate and sufficient indications of ~~defendant's~~ *appellant's* desires to stop fighting and the fact that ~~defendant~~ *appellant* had stopped fighting.

As worded, the instruction in question completely precluded the jury from considering the additional rule that the necessary notification of a declination to continue the fight is not necessary where the counterattack is so sudden and perilous that defendant did not have the opportunity to communicate his desires to stop fighting. Properly instructed the jury could have believed that rule to be applicable based upon ~~defendant's~~ *appellant's* testimony that after Carney let go of the gun and after ~~defendant~~ *appellant* started to back up toward the outer door, Carney lunged toward ~~defendant~~ *appellant* with his hands at shoulder height in a clenching grip posture, ~~defendant~~ *appellant* turned his body, got his neck out of the

way, fired the gun and apparently did not actually observe Carney at the time of the shot.    Whether this was the case, and whether ~~defendant~~ appellant was still entitled to the right to self-defense even though he may have been the initial aggressor, were matters to be determined by the jury with proper instructions on the subject.[3] That clearly did not occur in this case.

Next, it is ~~defendant's~~ appellant position that the error in question is such a structural defect in the fundamental fairness of ~~defendant's~~ appellant trial on a critical defensive matter that both federal and state constitutional principles of due process of law mandate that the error is prejudicial unless it can be determined by other properly given instructions the jury found the existence of the facts necessary to conclude, despite the error in issue, that the omitted issue was resolved adversely to ~~defendant~~ appellant. (See <u>People v. Flood</u>, <u>supra</u>, 18 Cal.4th 470, 503, including fn. 20; <u>People v. Cummings</u>, <u>supra</u>, 4 Cal.4th 1233, 1315.)  A major reason why this error is a structural defect to ~~defendant's~~ appellant trial is that on three separate occasions during closing argument to the jury, the prosecutor emphasized that there was no right to self-defense by ~~defendant~~ appellant since

---

3. Parenthetically, the July 2004 edition of CALJIC No. 5.54 has modified the language of the former version of the instruction on what is required for the right of self-defense to be available to the initial aggressor. After setting out the basic three requirements as contained in the older version of that instruction (see fn. 2 on p. 31 of this brief for the older version as read to the jury by the trial court), albeit in slightly different language, the most current version of CALJIC No. 5.54 finishes with the proviso that where there is a sudden and deadly counterattack, the original aggressor is not required to withdraw and may use reasonably necessary force in self-defense.

*appellant*
~~defendant~~ "created the whole situation" (R.T. 1018), sought "a quarrel with the

intent to create the necessity of exercising self-defense" (R.T. 1021), and

created "a situation where you're going to need to use self-defense" (R.T.

1067). The omitted proviso in question from the instruction on the availability

of self-defense by the initial aggressor would have gone a long way to temper

and counteract these one sided arguments of the prosecutor which were made

to a jury that did not know that an initial aggressor can regain the right to self-

defense without complying with all of the withdrawal requirements if the

counterattack by the ultimate victim is so sudden and perilous that the

defendant cannot withdraw. No legitimate and properly given instructions

exist in this case which would have allowed the jury to resolve this latter issue

adversely to ~~defendant~~ *appellant*. Therefore, the instructional error in question was

prejudicial.

On the other hand, if the instructional error in question is not a

structural defect going to the overall fundamental fairness of ~~defendant's~~ *appellant's* trial,

the error at a minimum has to be judged by the federal constitutional standard

of harmless error articulated in <u>Chapman v. California</u>, <u>supra</u>, 386 U.S. 18, 24

[17 L.Ed.2d 705] [harmless beyond a reasonable doubt]. (<u>People v. Quach</u>,

<u>supra</u>, 116 Cal.App.4th 294, 303.) As previously noted, when ~~defendant's~~ *appellant's*

case was tried the first time the jury was unable to reach a verdict. Also, as

just noted hereinabove, in this case the prosecutor on three occasions in

closing arguments made reference to the fact that ~~defendant~~ [appellant] could not claim self-defense since ~~defendant~~ [appellant] was the one who created the situation. The defense could have effectively countered those arguments if the proviso in issue had been added to the instruction on an initial aggressor regaining the right to self-defense. Furthermore, based upon ~~defendant's~~ [appellant's] testimony of what happened moments before the shooting as he was proceeding to back out of the bathroom (i.e., Carney lunged toward defendant with his hands at shoulder height in a clenching grip posture, ~~defendant~~ [appellant] turned his body, got his neck out of the way, fired the gun and apparently did not actually observe Carney at the time of the shot), there was a legitimate evidentiary basis for the proviso in question. Under such circumstances, one cannot say beyond a reasonable doubt that a jury would not have adopted a version of the events whereby, if ~~defendant~~ [appellant] were the initial aggressor, ~~defendant~~ [appellant] regained the right to self-defense due to the sudden attack by Carney. ~~Defendant~~ [Appellant] was entitled to an instruction, such as the one argued for in this issue, which would have enabled the jury to render a verdict in accordance with facts showing that ~~defendant~~ [appellant] regained a right of self-defense due Carney's sudden attack.

3. Erroneous and Incomplete Instructions on Imperfect Self-Defenses:

It is ~~defendant's~~ [appellant's] contention that the trial court committed prejudicial error in connection with its instructions on imperfect self-defense when it failed to instruct the jury that standard concepts applicable to issues of true

self-defense, such as the assailed person need not retreat (CALJIC No. 5.50), actual danger is not necessary (CALJIC No. 5.51) and the regaining of the right to self-defense by the initial aggressor, including the additional proviso just discussed in the immediately preceding issue (CALJIC No. 5.54), are equally applicable to the mitigating concept of imperfect self-defense.

In this case, the trial court gave the standard CALJIC instruction on imperfect self-defense contained in CALJIC No. 5.17. (R.T. 976; C.T. 520.) In substance, the jury instruction on imperfect self-defense advised the jury that imperfect self-defense would be available to reduce the charged offense of murder to voluntary manslaughter if ~~defendant~~ appellant had an actual, but unreasonable, belief in the necessity to defend himself against imminent peril to his life or great bodily injury to himself. The instruction then went on to give a definition to the words "imminent peril," explained that the imminent peril must have existed or appeared to ~~defendant~~ appellant to have existed at the very time the fatal shot was fired, and concluded by saying that the principle of imperfect self-defense ". . . is not available and malice aforethought is not negated if the [~~d~~]~~efendant~~ appellant by his wrongful conduct created the circumstances which legally justified his adversary's use of force, attack, or pursuit." (R.T. 976; C.T. 520.)

However, the trial court never instructed the jury that certain critical concepts applicable to the true defense of self-defense were also applicable to

the concept of imperfect self-defense, such as, the assailed person need not retreat (CALJIC No. 5.50), actual danger is not necessary (CALJIC No. 5.51) and the regaining of the right to self-defense by the initial aggressor, including the additional proviso just discussed in the immediately preceding issue (CALJIC No. 5.54).

Initially, it is well established that there are "close conceptual similarities" between imperfect (i.e., unreasonable) self-defense and the "actual" defense of "true" self-defense. (People v. Breverman, supra, 19 Cal.4th 142, 159.) As the California Supreme Court stated in People v. Barton (1995) 12 Cal.4th 186, 199-200, "[t]he *sole difference* between true self-defense and 'unreasonable self-defense' is that the former applies only when the defendant acts in response to circumstances that cause the defendant to fear, and would lead a reasonable person to fear, the imminent infliction of death or great bodily injury [citations]; unreasonable self-defense, on the other hand, does not require the defendant's fear to be reasonable." (Italics added and deleted.)

If, as the California Supreme Court noted in the Barton case, the sole difference between imperfect (unreasonable) self-defense and true self-defense is the aspect that imperfect self-defense does not require the ~~defendant's~~ appellant's fear to be reasonable, then all of the ancillary rules of self-defense, such as, the assailed person need not retreat (CALJIC No. 5.50), actual danger is not

necessary (CALJIC No. 5.51) and the regaining of the right to self-defense by the initial aggressor, including the additional proviso just discussed in the immediately preceding issue, are equally applicable to imperfect self-defense. However, in this case, these critical matters were never told to the jury by way of appropriate instructions from the trial court. That was error.

Furthermore, the error in question was compounded by the fact that in the standard instruction on imperfect self-defense the jury was told that imperfect self-defense ". . . [was] not available and malice aforethought [would] not [be] negated if the [~~d]efendant~~ appellant by his wrongful conduct created the circumstances which legally justified his adversary's use of force, attack, or pursuit." (R.T. 976; C.T. 520) While this portion of the instruction on imperfect self-defense is correct as far as it goes (see In re Christian S. (1994) 7 Cal.4th 768, 773, fn. 1, which is apparently the source for this part of the standard CALJIC instruction on imperfect self-defense), it becomes an inaccurate, misleading and erroneous statement of the law, where, as in the instant case, there is an evidentiary basis for giving, as the trial court did in this case for the true defense of self-defense, an instruction on the right of the initial aggressor to regain the availability of the defense of self-defense.

In fact, in footnote 1 of the Christian S. case, which appears to be the legal basis for the above-quoted proposition contained in CALJIC No. 5.17 for denying a ~~defendant~~ appellant the availability of imperfect self-defense where the

*appellant's*
~~defendant's~~ wrongful conduct created the circumstances for the adversary's use of force, the California Supreme Court goes on in that footnote to limit that rule to circumstances ". . . under which [the] adversary's attack or pursuit is *legally justified.*" (Italics added) (In re Christian S., supra, 7 Cal.4th 768, 773, fn. 1.) One of those circumstances where the adversary's attack would not be legally justified is where the *appellant* ~~defendant~~ has regained the availability to defend one's self because of the adversary's own improper attack, or at least where the *appellant* ~~defendant~~ actually believes in the existence of the adversary's own improper attack.

The only remaining issue is whether the instructional errors and omissions in question were prejudicial. Similar to what was discussed in the preceding issue as to why the error there under consideration (i.e., failing to include the sudden and perilous attack exception to the withdrawal requirements for an initial aggressor to regain the right to self-defense), the errors involved in the instant issues in failing to extend to imperfect self-defense standard concepts applicable to true self-defense, such as the assailed person need not retreat (CALJIC No. 5.50), actual danger is not necessary (CALJIC No. 5.51) and the regaining of the right to self-defense by the initial aggressor, including the additional proviso just discussed in the immediately preceding issue (CALJIC No. 5.54), created such a structural defect in the fundamental fairness of *appellant's* ~~defendant's~~ trial on a critical matter that both federal

and state constitutional principles of due process of law mandate that the errors

are prejudicial unless it can be determined by other properly given instructions

the jury found the existence of the facts necessary to conclude, despite the

errors in issue, that the omitted issues were resolved adversely to ~~defendant~~ appellant.

(See People v. Flood, supra, 18 Cal.4th 470, 503, including fn. 20; People v.

Cummings, supra, 4 Cal.4th 1233, 1315.)   As previously noted, when

~~defendant's~~ appellant's case was tried the first time the jury was unable to reach a verdict.

Also, as previously noted, in this case the prosecutor on three occasions in

closing arguments made reference to the fact that ~~defendant~~ appellant could not claim

self-defense, and inferentially imperfect self-defense, since ~~defendant~~ appellant was the

one who created the situation.  The defense could have effectively countered

those arguments if the trial court advised the jury that all of the applicable

ancillary instructions pertaining to self-defense were equally applicable to

imperfect self-defense, such as, the assailed person need not retreat (CALJIC

No. 5.50), actual danger is not necessary (CALJIC No. 5.51) and the regaining

of the right to self-defense by the initial aggressor, including the additional

proviso just discussed in the immediately preceding issue (CALJIC No. 5.54).

No legitimate and properly given instructions exist in this case which would

have allowed the jury to resolve those issue adversely to ~~defendant~~ appellant in the

context of imperfect self-defense.  Therefore, the instructional errors in

question were prejudicial.

Furthermore, based upon what has just been discussed in the preceding

paragraph, and based upon ~~defendant's~~ *appellant's* testimony of what happen moments

before the shooting as he was proceeding to back out of the bathroom (i.e.,

Carney lunged toward ~~defendant~~ *appellant* with his hands at shoulder height in a

clenching grip posture, ~~defendant~~ *appellant* turned his body, got his neck out of the way,

fired the gun and apparently did not actually observe Carney at the time of the

shot), there was a legitimate evidentiary basis for finding in ~~defendant's~~ *appellant's* favor

at least with regard to the issue of imperfect self-defense if proper, full and

complete instructions had been given as discussed in this issue. Under such

circumstances, one can say that it is reasonably probable that ~~defendant~~ *appellant* would

have obtained a more favorable outcome had the errors in question not

occurred. (<u>People v. Breverman</u>, <u>supra</u>, 19 Cal.4th 142, 164-178; <u>People v.</u>

<u>Watson</u>, <u>supra</u>, 46 Cal.2d 818, 836.)

4.    <u>Erroneous and Incomplete Instructions on Imperfect Self-</u>
      <u>Defenses</u>:

It is ~~defendant's~~ *appellant's* position that the prosecutor, during his closing

arguments to the jury, committed a serious act of misconduct when, over

defense counsel's objections, the prosecutor was permitted to argue to the jury

that when a killing is proved to have been committed by a ~~defendant~~ *appellant*, and

nothing further is shown, the presumption of the law is that the killing was

malicious and an act of murder.

Preliminarily, in its instructions to the jury, the trial court gave a full

41

compliment of jury instructions concerning first degree murder, second degree murder and voluntary manslaughter. Those instructions included the standard CALJIC instructions defining homicide (CALJIC No. 8.00), defining murder (CALJIC No. 8.10), defining malice aforethought (CALJIC No. 8.11), defining deliberate and premeditated murder (CALJIC No. 8.20), defining umpremeditated murder of the second degree (CALJIC No. 8.30), defining second degree murder based upon a killing resulting from an unlawful act dangerous to life (CALJIC No. 8.31), explaining the duty of the jury as to determining the degree of murder (CALJIC No. 8.70), explaining the issue of reasonable doubt as to whether the homicide was first or second degree murder (CALJIC No. 8.71), defining voluntary manslaughter (CALJIC No. 8.40), defining the concept of sudden quarrel or heat of passion (CALJIC No. 8.42), explaining the concept of a cooling off period distinguishing murder from manslaughter (CALJIC No. 8.43), explaining that no specific emotion alone constitutes heat of passion (CALJIC No. 8.44), distinguishing murder from manslaughter (CALJIC No. 8.50), defining the need for legal causation for the homicide (CALJIC No. 8.55), explaining the concept of reasonable doubt as to whether the homicide is murder or manslaughter (CALJIC No. 8.72), explaining how evidence of provocation may be considered in determining the degree of murder (CALJIC No. 8.73), the need for a unanimous verdict with regard to whether the offense is first degree murder, second degree murder or

manslaughter (CALJIC No. 8.74), explaining the concept of returning a partial verdict with regard to the character of the homicide (CALJIC No. 8.75), and explaining how an actual but unreasonable belief in the necessity of self-defense is voluntary manslaughter (CALJIC No. 5.17). (R.T. 963-972, 976; C.T. 492-512, 520.)

Then, in closing arguments, the prosecutor, when discussing the law concerning murder said, in pertinent part, the following: "Deliberation and premeditation is not required for second-degree murder. It's just an intentional killing, essentially, a killing done with malice, a killing done expressly with express malice or implied malice, an intentional act. Deliberation and premeditation are not required for second-degree murder. [¶] What's an example of second-degree murder? If A kills B and that's all you know, it's second degree murder. And the quote here from a California case: 'When a killing is proved to have been committed by the ~~Defendant~~ *appellant* and nothing further is shown, the presumption applies that it was malicious and an act of murder.'" (R.T. 998.)

Shortly after the prosecutor made that argument, defense counsel interposed an objection that the prosecutor was making an inaccurate statement of the law with respect to second degree murder. (R.T. 999.) Moments later the jury was excused, and there was a discussion among counsel and the trial court concerning the appropriateness of the prosecutor's argument that when a

killing is proved to have been committed and nothing further is shown, then a presumption applies that the killing was malicious and an act of murder. (R.T. 999-1002.) Even though the trial court thought that the argument in question undermined reasonable doubt and seemed to shift that burden, nevertheless, the trial court allowed the prosecutor to continue on with the type of argument in issue. (R.T. 1000, 1002.)

When the jury came back in, the prosecutor proceeded on with his argument as follows: "From the chart that you're looking at as an example of a second degree implied malice murder. And the case says 'It is settled that the necessary element of malice may be inferred from the circumstances of the homicide.' Implied malice, this is an example. So if A kills B and that's all you know, that's an implied malice second-degree murder. [¶] And the case goes onto say 'When the killing is proved to have been committed by the ~~Defendant~~ *Appellant* and nothing further is shown, the presumption of the law is that it was malicious and an act of murder.' In such a case, the verdict should be murder of the second-degree and not murder of the first degree, which is why this is an example of a second." (R.T. 1003.)

Admittedly, the prosecutor was initially correct in stating that there is case law which provides that when a killing is proved to have been committed by the ~~defendant~~ *appellant*, and nothing further is shown, the presumption of the law is that it was malicious and an act of murder. (People v. Anderson (1968) 70

44

Cal.2d 15, 36; <u>People v. Craig</u> (1957) 49 Cal.2d 313, 319; <u>People v. Frye</u> (1992) 7 Cal.App.4th 1148, 1154.) However, contrary to what the prosecutor said and did in the trial court, it is well settled that such language is never to be communicated to a jury (i.e., it is always excluded from jury consideration), since it improperly shifts the burden of proof to the defendant in a homicide case with regard to producing evidence mitigating murder to manslaughter or otherwise totally eliminating murder by evidence of justification or excuse, such as, self-defense. (See <u>People v. Kelley</u> (1980) 113 Cal.App.3d 1005, 1009-1013; see also <u>People v. Loggins</u> (1972) 23 Cal.App.3d 597, 600-605.) In fact, in <u>People v. Kelley</u>, <u>supra</u>, 113 Cal.App.3d 1005, 1013, the appellate court specifically condemned the use of the type of hypothetical propounded by the prosecutor in this case that if A killed B, and that is all you know, it is second degree murder.

In short, the principle that where there is a killing, and nothing further is shown, the presumption of the law is that the killing was malicious and an act of murder, is merely a procedural rule that imposes a duty of going forward with evidence and is something that a jury should never be told. (<u>People v. Kelley</u>, <u>supra</u>, 113 Cal.App.3d 1005, 1010-1013; <u>People v. Loggins</u>, <u>supra</u>, 23 Cal.App.3d 597, 601-603; see also <u>People v. Deloney</u> (1953) 41 Cal.2d 832, 840-842; <u>People v. Cornett</u>, <u>supra</u>, 33 Cal.2d 33, 42-43; <u>People v. Garcia</u> (1972) 27 Cal.App.3d 639, 647.)

What is particularly insidious about the legal statement made by the prosecutor to the jury is that it contained the concept of a "presumption." It must be kept in mind that the use of the word "presume," or its derivations, in an appellate opinion usually does not involve issues on legal principles to be communicated to a jury. Such words are generally used in an appellate opinion with regard to issues concerning a statement of substantive law or an analysis of an issue of sufficiency of evidence on appeal. (People v. Colantuono (1994) 7 Cal.4th 206, 220-221, including fn. 13 on p. 221.) Furthermore, by interjecting into a jury's consideration the concept of a "presumption," it creates a significant problem affecting the jury's proper role. As the California Supreme Court cautioned in People v. Colantuono, supra, 7 Cal.4th 206, 221, ". . . the jury must clearly understand their responsibility to resolve [a] question beyond a reasonable doubt, uninfluenced and unassisted by any other principle of law. [Citations.] Moreover, in light of recent refinements by the United States Supreme Court regarding presumptions and their effect on the prosecution's burden of proof,[4] any reference to the word 'presumed' or its derivations can prove problematic on review. [Citations.]" (Fn. added.) Thus, in the trial court, when it comes to explaining the applicable law to a jury, the word "presumed," and the word "presumption,"

---

4. See Carella v. California (1989) 419 U.S. 263, 265-267 [105 L.Ed.2d 218]; Rose v. Clark (1986) 478 U.S. 570, 579-582 [92 L.Ed.2d 460]; Connecticut v. Johnson (1983) 460 U.S. 73, 84-86 [74 L.Ed.2d 823]; Sandstrom v. Montana (1979) 422 U.S. 510, 514-519 [61 L.Ed.2d 39].

need to be avoided.

It is clear that in the instant case the prosecutor in closing arguments to the jury made a serious and significant misstatement of the law when the jury was told on two different occasions that if A killed B and that is all you know, it is second degree murder, and that when a killing is proved to have been committed by a defendant and nothing further is shown, the presumption applies that it was malicious and an act of murder. (R.T. 998, 1003.) In this regard, it is settled that it is improper for a prosecutor to misstate the law generally, and particularly to attempt to absolve, as in the instant case, the prosecution from its prima facie obligation to overcome reasonable doubt on all elements. (People v. Hill (1998) 17 Cal.4th 800, 829; People v. Marshall (1996) 13 Cal.4th 799, 831; People v. Gonzalez (1990) 51 Cal.3d 1179, 1215.)

The only remaining issue is whether the prosecutorial misconduct in question, which was not corrected by the trial court after an appropriate objection was interposed by defense counsel, constituted prejudicial error. As will be detailed hereinbelow, in light of the particular circumstances of this case, the misconduct in question, with regard to a significant misstatement of the law, is prejudicial under any standard for evaluating the prejudicial effect of an error.

In this case there was a previous jury trial which resulted in a mistrial due to the jury being unable to reach a verdict. (C.T. 336-364.) Additionally,

significant portions of that prior trial have been augmented as part of the appellate record in this matter, including a reporter's transcript of the instructions read to the jury and the arguments of both the prosecutor and defense counsel at that earlier trial. (Augmented R.T. 434-580.) A review of those jury instructions indicate that there were no different defenses than those raised in the trial involved in this appeal.   (Augmented R.T. 434-467.) Defense counsel's prior closing arguments, as in this case, focused on the concepts of self-defense, imperfect self-defense and sudden quarrel and heat of passion. (Augmented R.T. 524-556.) The prosecutor had the same basic arguments in both trials. However, there was one exception. At the first trial, when the prosecutor was discussing the elements of first degree murder, second degree murder and voluntary manslaughter, the prosecutor neither at that time, nor at any other time, during his arguments to the jury in the first trial brought up the totally improper argument that if A kills B and that is all you know, it is second degree murder, and that when a killing is proved to have been committed by a defendant and nothing further is shown, the presumption applies that the killing was malicious and an act of murder.

In short, when the case against ~~defendant~~ appellant was tried without the improper argument in question (i.e., a presumption of second degree murder), the jury was unable to reach a verdict and a mistrial was declared. However, when there was a trial of ~~defendant's~~ appellant's case with the improper misconduct of the

48

prosecutor telling the jury about a presumption of second degree murder, the jury returned a verdict of second degree murder. Thus, under any standard for assessing the prejudicial effect of error (<u>People v. Watson</u>, <u>supra</u>, 46 Cal.2d 818, 836 [reasonably probable that the defendant would have obtained a more favorable outcome]; <u>Chapman v. California</u>, <u>supra</u>, 386 U.S. 18, 24 [17 L.Ed.2d 705] [harmless beyond a reasonable doubt]), the improper misconduct in this case constitutes prejudicial error.

Furthermore, it is <s>defendant's</s> appellant's position that the particular error in question, over and above what has already been discussed hereinabove, amounts to a federal constitutional error. When a prosecutor's improper comment during closing argument to a jury impinges upon or violates a defendant's federal constitutional right or rights that comment itself is a federal constitutional violation. (See <u>United States v. Hastings</u> (1983) 461 U.S. 499, 507-509 [76 L.Ed.2d 96] [improper comment on the right not to testify at trial]; <u>Doyle v. Ohio</u> (1976) 426 U.S. 610, 619, including fn. 5 on pp. 614-615 [49 L.Ed.2d 91] [improper comment on exercise of right to remain silent after advisement of <u>Miranda</u> rights]; <u>Griffin v. California</u> (1965) 380 U.S. 609, 610-614 [14 L.Ed.2d 106] [improper comment on the right not to testify at trial]; <u>People v. Harvey</u> (1992) 2 Cal.4th 86, 153-154 [improper comment on the right not to testify at trial]; <u>People v. Vargas</u> (1973) 9 Cal.3d 470, 475, 478 [improper comment on the right not to testify at trial]; <u>People v.</u>

Givans (1985) 166 Cal.App.3d 793, 801 [improper comment on exercise of right to remain silent after advisement of Miranda rights].)

In this case, the prosecutor's improper comments impermissibly impinged upon the federal constitutional protections against interjecting into a jury's consideration the concept of a presumption. (See cases cited in fn. 4 on p. 46 of this brief.) As such, the prosecutor's improper comments in issue constitute a federal constitutional violation. As already discussed hereinabove, under the facts and circumstances of this case, these improper comments were not harmless beyond a reasonable doubt under the Chapman standard (Chapman v. California, supra, 386 U.S. 18, 24 [17 L.Ed.2d 705]) that must be applied to federal constitutional violations. (See People v. Vargas, supra, 9 Cal.3d 470, 478; People v. Givans, supra, 166 Cal.App.3d 793, 801.)

> 5. Discovery Violations and New Evidence as to Issues Pertaining to the Credibility of a Key Prosecution Witness:

It is ~~defendant's~~ *appellant's* position that due to various discovery violations concerning withheld materials pertaining to the credibility of a key prosecution witness, and due to new evidence discovered after ~~defendant's~~ *appellant's* trial as to various matters pertaining to the credibility of that same key prosecution witness, all of which was presented to the trial court in a motion for new trial, ~~defendant~~ *appellant* is entitled to a reversal of his conviction. As will be developed hereinbelow, the issue in question centers around moral turpitude evidence pertaining to the credibility of prosecution witness Dr. Gregory Schmunk who

was the chief medical examiner who testified at ~~defendant's~~ trial as a witness called by the prosecution.

The pertinent facts pertaining to the issue now under consideration are as follows: At ~~defendant's~~ *appellant's* trial, Dr. Gregory Schmunk opined, among other things, that when Carney was shot by the single gunshot, the firearm barrel was probably within a few inches (one or two inches) from Carney's chest. Dr. Schmunk based this opinion on the fact that there was gunpowder stippling (unburnt gunpowder residue) embedded in the skin immediately around the gunshot wound in the chest and that the diameter of this stippling was about one inch. (R.T. 621-624, 631.) Also, Dr. Schmunk opined that at the time the bullet was fired into Carney's chest, Carney was not moving forward. Dr. Schmunk based this opinion on the fact that at the scene of the crime Carney was found on his back and on the fact that the single bullet wound to the chest resulted in a bullet going through, among other things, Carney's spinal cord and damaging that spinal cord. As a result of this spinal cord damage, it was Dr. Schmunk's opinion that if Carney had been moving forward at the time of the gunshot Carney would have collapsed forward. On the other hand, since Carney was found on his back, it was Dr. Schmunk's opinion that as a result of the spinal cord damage, Carney, who would have been immediately paralyzed from about the waist down, either was standing up and not moving, or was moving backward, at the time of the gunshot. (R.T. 625, 628-630,

632.)

Dr. Schmunk presented the above-described testimony at defendant's *appellant's*

trial on August 12, 2003. (R.T. 610, 613.) In testifying about his qualifications as a forensic pathologist, Dr. Schmunk established the following pertinent facts pertaining to his career: He graduated from the University of Southern California, School of Medicine in 1983. He began a pediatrics residency program at Children's Hospital in Los Angeles, but then had the opportunity to go back to college at the University of California at San Diego and join a group of researchers in immunology and pathology. After several years as a post-doctoral fellow researcher at the University of California in San Diego, he then decided to formally go into the field of pathology. He applied to and was accepted into, the Anatomic Pathology Training Program at the University of Washington in Seattle, Washington. He spent two years in training at that university and then went to the King County Medical Examiner's Office in Seattle, Washington, for his forensic pathology fellowship. (R.T. 615.)

Thereafter, Dr. Schmunk's first real job as a forensic pathologist was in Sacramento County, California, where he was a pathologist for the coroner's office in that county. Next, he had a brief period of time following that employment where he was with the San Francisco Medical Examiner's Office. Then, sometime in about 1995, he was employed as the Chief Medical

Examiner for Brown County, Wisconsin, which is in the area of Green Bay. He held that position for approximately just over four years when he received his employment as the Chief Medical Examiner in the coroner's office for the County of Santa Clara. At the time he was testifying at ~~defendant's~~ appellant's trial on August 12, 2003, he had held his position as the Chief Medical Examiner in Santa Clara County for just over four years. (R.T. 613-614.)

Two days later, on August 14, 2003, while ~~defendant's~~ trial was still continuing, an article appeared in the San Jose Mercury indicating that Dr. Gregory Schmunk, who was hired in Santa Clara County in 1999, to clear up that county's troubled Medical Examiner's Office, was facing arrest in Wisconsin for stealing books from his former employer and then failing to appear in court. The article went on to say that, according to the prosecutor in Wisconsin, it was alleged that Dr. Schmunk had stolen approximately $400 worth of medical textbooks from Brown County in Wisconsin when he left his job as the medical examiner in that county in February 1999. (R.T. 840-841; Court Exhibit "C"; C.T. 578-579.)

The San Jose Mercury article then went on to indicate that Dr. Schmunk acknowledged taking the books and explained that he did so because Brown County owed him money. Dr. Schmunk also acknowledged that he refused to go to court in Green Bay after the charges were filed in November 2000. According to Dr. Schmunk all of his "cop friends" and all of his "D.A.

friends" had told him to "forget about it." Dr. Schmunk added that he had no

plans to return to Wisconsin to clear up the warrant. (Court Exhibit "C"; C.T.

578-579.)

On that same day, August 14, 2003, a hearing was held in the trial court

in ~~defendant~~'s *appellant's* matter in relation to the then very recent revelations concerning

the theft incident and pending charges against Dr. Schmunk in Wisconsin.

Early on in that hearing, the prosecutor in ~~defendant's~~ case stated, with

regard to any prior knowledge of the matters referred to in the newspaper

article, "[e]verything that I know about this is nothing, so that's everything that

I know." (R.T. 842.) Additionally, at the hearing on August 14, 2003, Dr.

Schmunk came in and testified under oath about his alleged conduct back in

Wisconsin. Dr. Schmunk explained that up to February 2000, he had been in

constant contact with the prosecutor back in Wisconsin, and then with a

presiding judge in Brown County, trying to find out what specifically the

officials in Wisconsin thought he (Dr. Schmunk) had in his possession that

belonged to Brown County. Dr. Schmunk admitted that he had three or four

textbooks in his possession, and he said that he had tried to get some official

word that would indicate to him that if he returned those final few books that

would satisfy the needs of the prosecutor in Wisconsin. Dr. Schmunk sent

several letters to the prosecutor in Wisconsin and received several letters back

which did not answer his overriding question as to what would satisfy that

54

prosecutor's needs. When Dr. Schmunk could not receive a satisfactory answer, he wrote to the presiding judge in the Brown County area soliciting a resolution of the matter. (R.T. 864-865.)

Apparently, according to Dr. Schmunk in his early communications with the officials in Brown County, those officials originally identified a list of about 25 things that they claimed that Dr. Schmunk still had in his possession. The doctor sent many of those things back. Then, he would receive some communications from Brown County adding a few extra things to the list and then subtracting other things. By the end of 1999, according to Dr. Schmunk, he would send some things back and then all of a sudden the officials in Brown County would want something else. His last correspondence was to the judge in Brown County in February 2000. Since then Dr. Schmunk had not heard anything from Brown County and just ignored the matter. (R.T. 865-868.) Dr. Schmunk admitted being aware of the arrest warrant since January or February 2000, and that he had done nothing since his last written communication in February 2000. (R.T. 869.) With regard to the "cop friends" and "D.A. friends" he talked to about the matter, all of those friends were individuals back in Brown County, Wisconsin. According to Dr. Schmunk, he was basically told by those friends that since he was making some reasonable efforts and he was not hearing back from the people, then maybe those people (the individuals in Brown County) just wanted to let it be.

(R.T. 870.) Dr. Schmunk told only two people in Santa Clara County about the matters back in Wisconsin. One was the Santa Clara County executive by the name of Richard Wittenberg, and this occurred when the doctor sent Wittenberg a letter about the matter in March 2000. Dr. Schmunk also told his program manager Diana Hunter about the Wisconsin matter. (R.T. 852-853, 870.)

After Dr. Schmunk's testimony there was considerable discussion between the trial court, the prosecutor and ~~defendant's~~ appellants trial counsel about what to do in ~~defendant's~~ appellants case, including the subject of a continuance. Ultimately, it was concluded by the trial court to continue on with ~~defendant's~~ appellants case and to allow ~~defendant's~~ appellants trial counsel to recall Dr. Schmunk and examine him before the jury concerning the events in Wisconsin. (R.T. 881-882, 884, 889-890, 897-898, 901.)

On the next day, August 15, 2003, Dr. Schmunk was recalled by ~~defendant's~~ appellants trial counsel to testify before the jury in this case. (R.T. 910, 913.) Before the jury, Dr. Schmunk testified that he left Brown County, Wisconsin in February 1999, where he had been employed as a medical examiner. According to Dr. Schmunk's testimony before the jury he actually first became aware of the outstanding criminal complaint against him in early 2002. He found out about this outstanding criminal complaint for the theft of the medical books from a reporter friend in Brown County. Dr. Schmunk believed he

received his information from his reporter friend around January 2002. (R.T. 914-915.)

Dr. Schmunk explained that the medical textbooks in question had a value of about $400. (R.T. 917.)    The doctor also explained that when he left his job in Brown County in February 1991, he took everything very quickly all in one day in order to move because of his new job in Santa Clara County. (R.T. 917.)    The doctor admitted that his last correspondence with the prosecutor in Wisconsin, prior to his testimony at ~~defendant~~ appellant's trial, was in June 2000, and it was an attempt to resolve everything in Wisconsin. The doctor said he waited for a response, but he heard nothing. When he heard about the bench warrant, Dr. Schmunk wrote a judge to see if the judge could intervene and resolve the matter. Dr. Schmunk wrote that judge in February 2002. The doctor did not do anything beyond that until August 14, 2003, the day before the doctor was then testifying before ~~defendant~~ appellant's jury. On that date (August 14, 2003) the doctor called the prosecutor in Wisconsin and resolved everything by sending a check to the prosecutor for the value of the medical textbooks. (R.T. 917-922.)

Thereafter, on August 19, 2004, the jury in defendant's case returned a verdict finding defendant guilty of second degree murder. (C.T. 547-552.)

Later, ~~defendant~~ appellant filed a motion for a new trial containing additional information about Dr. Schmunk which clarified and expanded upon the

57

Wisconsin book theft incident and set forth some new revelations of Dr. Schmunk's past. (C.T. 566-568.) None of this new and additional information was every contradicted by the prosecution. (C.T. 646-658.)

As developed in the various pleadings pertinent to ~~defendant's~~ appellant's motion for new trial, the new and additional revelations concerning Dr. Schmunk were as follows:

On May 12, 1994, while Dr. Schmunk was working at the Sacramento County Coroner's Office, he got into an argument with his manager one Robert Wood. (C.T. 602.) Apparently Dr. Schmunk and Wood had had a longstanding verbal conflict resulting in personality clashes between the two of them. (C.T. 607.) At 4:30 p.m., on May 12, 1994, Wood put a letter on Dr. Schmunk's desk advising Dr. Schmunk that he (Dr. Schmunk) would no longer participate in a brain meth study unless directed by the coroner of Sacramento County. (C.T. 601-602.) After Wood put that letter on Dr. Schmunk's desk, Wood returned to his office to leave for the day. Dr. Schmunk came into Wood's office and asked Wood if he (Dr. Schmunk) could talk with Wood in Dr. Schmunk's office. Wood agreed and went with Dr. Schmunk to Dr. Schmunk's office. Dr. Schmunk sat in his desk chair, put his feet up on the desk and asked Wood to sit down. Wood did so. Dr. Schmunk then told Wood in a patronizing and condescending manner that he (Dr. Schmunk) realized that Wood was only trying to help, but that Wood had

caused Dr. Schmunk problems by not bringing the research request to him (Dr. Schmunk). (C.T. 602.)

Wood then got up to leave. Dr. Schmunk got between Wood and the door and prevented Wood from opening the door. Dr. Schmunk said that he wanted to talk to Wood. Wood told Dr. Schmunk that he (Wood) had to go. Dr. Schmunk would not move. Wood then went to the telephone in Dr. Schmunk's office, picked it up and dialed a Dr. Anthony. Dr. Schmunk pulled the telephone cord from the wall. (C.T. 602.)

Wood then went to the door. However, Dr. Schmunk got between the door and Wood. Wood began shouting "Let me out of hear." Dr. Schmunk told Wood that he just wanted to talk to him. Dr. Schmunk would not move and continued to block the door. Wood grabbed Dr. Schmunk's coat collar and forcibly moved Dr. Schmunk aside. Wood then went down the hallway and yelled words to the effect that "If you do that to me again, I'll kill you – I'll rip your fucking head off – I'll fucking kill you." (C.T. 602.) At that time it apparently was common knowledge that Dr. Schmunk carried a gun. (C.T. 602, 604.)

Thereafter, on May 31, 1994, Robert Wood commenced a civil action against Dr. Schmunk for what occurred on May 12, 1994. (C.T. 609-610) An arbitration award was entered against Dr. Schmunk in the sum of $2,500 on March 14, 1995. (C.T. 611.) Full satisfaction of that judgment was

acknowledged as of June 16, 1995. (C.T. 612.)

On December 10, 1999, Dr. Schmunk executed an application, under penalty of perjury, for a license to carry a concealed weapon. (C.T. 616.) Question 5 in that application asked, "Are you now, or have you been, a party to a lawsuit in the last five years?" Dr. Schmunk checked "No" for an answer. (C.T. 617.) Question 10 in that application asked, "Have you withheld any fact that might affect the decision to approve this license?" Again, Dr. Schmunk checked "No" for an answer. (C.T. 618.)

Next, on or about October 22, 2003, the Santa Clara County District Attorney's Office provided to ~~defendant's~~ appellant's trial counsel, among other things, a confidential memorandum dated August 15, 2003, from Bill Larsen, a Special Assistant District Attorney at the Santa Clara County District Attorney's Office to Paula Kuty, a Chief Assistant District Attorney at the Santa Clara District Attorney's Office. (C.T. 568, 595.) In that confidential memorandum Special Assistant District Attorney Bill Larsen indicated that "[t]he attached articles copied from the April 9, 10 and 16, 1999, additions of the Green Bay Press - Gazette were brought to my attention on or about April 29, 1999." (C.T. 595.)

The article from April 9, 1999, indicated, among other things, that Dr. Schmunk was in a dispute with Brown County about 18 autopsies he did not finish and then took with him when he resigned in February 1999. Dr.

60

Schmunk had said the autopsies were his professional responsibility to finish, but he would not finish them until Brown County paid him for his time. The county contended that Dr. Schmunk took the autopsies without permission and said it would not pay him. (C.T. 596.)

The article from April 10, 1999, indicated that Dr. Schmunk had finished 3 of the 18 autopsies that he had taken with him when he resigned to take a job in California, but that he was not backing down in his dispute with Brown County. Dr. Schmunk had indicated that he should be paid about $1,800 to finish the autopsies. However, he said he would not withhold the autopsies because he had another bargaining chip. Brown County also wanted back about 20 items missing from the Medical Examiner's Office which were valued at about $1,700 to $1,800. These items included medical reference books, raincoats and a portable light. In that article Dr. Schmunk was quoted as saying "I can say to them 'You say there's some things that I have that are the property of Brown County. Well, I'm saying that you owe me some money. Let's work out a resolution.'" Dr. Schmunk also was quoted as saying, "Maybe what we'll end up saying is that it's a wash." (C.T. 598.)

The article of April 16, 1999, indicated that Dr. Schmunk had agreed to finish the 15 remaining autopsies files that he had taken with him when he left his job in Brown County. The article further indicated that Brown County also wanted back about $1,700 to $1,800 worth of medical reference books

61

and other items that the county claimed Dr. Schmunk may have taken with him. Dr. Schmunk said that he did have some of the county's items but he planned to hold on to them until the county paid him the $1,800 he said the county owed him. The article also indicated that the agreement reached only dealt with the autopsies and did not resolve the property issue. (C.T. 599.)

Turning to the merits of defendant's claim, the instant case is a classic situation where the prosecution significantly failed to live up to its federal, constitutionally compelled discovery obligations (stemming from the due process clause of the Fourteenth Amendment of the United States Constitution) to provide to the defense, even without a request, all substantial material evidence favorable to an accused, whether such evidence relates directly to the question of guilt, to matters relevant to punishment, or to the credibility of a material witness. (Kyles v. Whitley (1995) 514 U.S. 419, 432 [131 L.Ed.2d 490]; United States v. Bailey (1985) 473 U.S. 667, 682 [87 L.Ed.2d 481]; United States v. Agars (1976) 427 U.S. 97, 110-111 [49 L.Ed.2d 342]; Giglio v. United States (1972) 405 U.S. 150, 153 [31 L.Ed.2d 104]; Brady v. Maryland (1963) 373 U.S. 83, 87 [10 L.Ed.2d 215]; In re Williams (1994) 7 Cal.4th 572, 611; People v. Ruthford (1975) 14 Cal.3d 399, 406; In re Ferguson (1971) 5 Cal.3d 525, 532-533.) Furthermore, this obligation extends to information that ". . . might lead the defense to favorable evidence." (In re Ferguson, supra, 5 Cal.3d 525, 532-533.)

Dr. Schmunk was obviously a material witness for the prosecution. He provided testimony critical the prosecution's case that was more than the mere cause of death. Dr. Schmunk provided critical testimony when he opined that when Carney was shot by the single gunshot, the firearm barrel was probably within a few inches (one or two inches) from Carney's chest. Dr. Schmunk based this opinion on the fact that there was gunpowder stippling (unburnt gunpowder residue) embedded in the skin immediately around the gunshot wound in the chest and that the diameter of this stippling was about one inch. (R.T. 621-624, 631.) Also, Dr. Schmunk opined that at the time the bullet was fired into Carney's chest, Carney was not moving forward. Dr. Schmunk based this opinion on the fact that at the scene of the crime Carney was found on his back and on the fact that the single bullet wound to the chest resulted in a bullet going through, among other things, Carney's spinal cord and damaging that spinal cord. As a result of this spinal cord damage, it was Dr. Schmunk's opinion that if Carney had been moving forward at the time of the gunshot Carney would have collapsed forward. On the other hand, since Carney was found on his back, it was Dr. Schmunk's opinion that as a result of the spinal cord damage, Carney, who would have been immediately paralyzed from about the waist down, either was standing up and not moving, or was moving backward, at the time of the gunshot. (R.T. 625, 628-630, 632.) This was all very critical and material evidence to attempt to refute

63

appellant's

~~defendant's~~ claim that Carney lunged at ~~defendant~~ appellant just a moment before appellant ~~defendant~~ fired his gun in self-defense.

Next, based upon the memorandum dated August 15, 2003, at least one key member of the Santa Clara County District Attorney's Office, as early as April 29, 1999, some four years before the commencement of the trial leading appellant's to ~~defendant's~~ conviction in this case, was fully aware of Dr. Schmunk's misconduct in Brown County, Wisconsin. (C.T. 595-599.) That misconduct not only consisted of the alleged theft of the medical textbooks and other items, but the applicable information showed that for all practical purposes Dr. Schmunk was engaging in what can best be described as attempted acts extortion against officials in Brown County, Wisconsin, with regard to uncompleted autopsy reports. Such conduct clearly would be material information relevant to the impeachment of a witness who was called to testify appellant's at ~~defendant's~~ trial as an expert witness in a field of expertise to which the acts of attempted extortion related. None of this pertinent information was provided to defense counsel by the Santa Clara County District Attorney's appellant's Office until on or about October 22, 2003, some two months after ~~defendant's~~ trial. (C.T. 568.) This is the case even though the memorandum in question was dated August 15, 2003, which was a date on which defendant's case was still proceeding with trial, and which coincidentally was the date on which Dr. Schmunk was recalled by the defense to testify before the jury. (C.T. 459,

64

595.)

Next, when Dr. Schmunk was recalled by the defense to testify at appellants ~~defendant's~~ trial, all defense counsel had was a very recent newspaper article discussing only the doctor's theft matter with regard to the textbooks. (R.T. 840-841; Court Exhibit "C"; C.T. 578-579.) The newspaper article did not mention anything about the attempted extortion with regard to the uncompleted autopsy reports. (C.T. 578-579.) That information was in the possession of the Santa Clara County District Attorney's Office for more than four years prior thereto, and still it was not discovered to appellants ~~defendant's~~ trial counsel at that time. Again, it was two months later before that this information was finally turned over to appellants ~~defendant's~~ trial counsel.

Moreover, after the revelations of the misconduct of Dr. Schmunk in relation to Brown County, Wisconsin, further investigation after the end of appellants ~~defendant's~~ trial resulted in the discovery of (1) Dr. Schmunk's confrontation when he worked at the coroner's office in Sacramento County and (2) what can clearly and unequivocally be described as outright perjury by Dr. Schmunk in his application to carry a concealed weapon. (C.T. 568, 600-618.)

Until the revelations concerning all of the Brown County misconduct, no reasonable person would have really suspected all of the transgressions committed by Dr. Schmunk. With the revelations of all of the Brown County matters, the additional matters were found concerning the Sacramento incident

65

and the perjury in the gun permit application. Someone in possession of all of the Brown County information might reasonably expect such information could lead to other relevant information, just as it did in this matter. All of this critical information, except for the mere incident of the theft of the textbooks, was denied to ~~defendant's~~ *appellants* trial counsel by the discovery violation that occurred in this case.

Finally, without belaboring the point too much, it cannot be doubted that due to (a) the critical importance of Dr. Schmunk's testimony, (b) the relevant and material nature of the impeachment evidence discussed hereinabove, major portions of which were denied to ~~defendant's~~ *appellants* trial counsel due to the prosecution's discovery violation, and (c) the true closeness of the evidence in defendant's case as evidenced by the fact that a prior jury could not reach a verdict, there is a reasonable probability that had full and complete disclosure of the Brown County matters in question been made in a timely fashion, which then would have lead to the Sacramento incident and the perjury matter, the result in defendant's case would have been different. This being the case, defendant is entitled to a new trial. (See In re Sassounian (1995) 9 Cal.4th 535, 543-546; In re Pratt (1999) 69 Cal.App.4th 1294, 1312-1314.)

6.    The Cumulative Effect of the Errors:

Even if the any or all of the errors discussed hereinabove by themselves

66

do not constitute valid grounds for reversing defendant's conviction, it is ~~defendant's~~ contention that the cumulative effect of those individual errors requires the reversal of his conviction. (See <u>People v. Holt</u> (1984) 37 Cal.3d 436, 459; <u>People v. Cardenas</u> (1982) 31 Cal.3d 897, 907; <u>People v. Kronemyer</u> (1987) 189 Cal.App.3d 314, 349.)

It is also ~~defendant's~~ position that where, as here, the cumulative effect of the individual errors in question results in a trial that is fundamentally unfair, the verdict must be reversed for a violation of due process under the Fifth Amendment and the Fourteenth Amendment of the United States Constitution. (See <u>Cooper v. Sowders</u> (6th Cir. 1988) 837 F.2d 284, 286-288.)

CONCLUSION

For the reasons discussed hereinabove, ~~defendant and~~ appellant Ronald Paul McKean respectfully requests this court to reverse the judgment of conviction entered against him.

Respectfully submitted,

Dated: ~~December 20, 2004~~
      May 1, 2008

*Ronald Mckean*

~~ARTHUR DUDLEY~~
~~Attorney for Defendant and Appellant~~
Ronald Mc Kean
Petitioner

67

1

### PROOF OF SERVICE BY MAIL

2

3        I, _Ronald Paul McKean_____, declare;

4   I am at least 18 years of age, and a party / and not a party to the attached herein

5   cause of action. My mailing address is;

6                    PLEASANT VALLEY STATE PRISON
                  FACILITY D, BUILDING _5_, CELL _120_
7                      POST OFFICE BOX 8504
                      COALINGA CALIFORNIA
8                        93210-8504

9   On _May 3___,200_8_, I delivered to prison officials at Pleasant Valley

10  State Prison at the above address the following documents for mailing via the U.S.

11  Postal Service:

12  1. ~~Certificate of funds~~

13  2. ~~In forma Pauperis application~~

14  3. writ of habeas corpus petition

15  4._____

16

17  In a sealed envelope(s) with postage fully prepaid, addressed to:

18  1. U.S. District Court 280 S. First St. #2112 San Jose Ca 95113

19  2. Office of the Attorney General!

20      455 Golden Gate Ave. Ste. 11000  S.F. Ca. 94102

21  _____

22  3._____

23  _____

24  4._____

25  _____

26

27        I declare under penalty of perjury that the  foregoing is true and correct.

28  Executed this _3_ day of ~~April~~ May , 200_8_, at Coalinga, California.

_Ronald Paul McKean_
Petitioner / Declarant IN PRO PER

Ronald McKean V22458
PVSP Pob 8504
DS 120
Coalinga CA 93210

THIS MAIL WAS GENERATED FROM
PLEASANT VALLEY STATE PRISON

U.S. Northern District
280 S. First St. #2112
San Jose CA

951

